RICHARD L. LUCAS *et al.*, Plaintiffs-Appellants, v. DOWNTOWN GREEN-VILLE INVESTORS LIMITED PARTNERSHIP *et al.*, Defendants-Appellees.

Second District No. 2—95—1376

Opinion filed October 4, 1996.

Donovan & Roberts, P.C., of Wheaton (Keith E. Roberts, Sr., Robert J. Lentz, and Rosemarie Calandra, of counsel), for appellants.

Gomberg, Kane & Fischer, Ltd., of Chicago (Ronald P. Kane and Michael A. Kraft, of counsel), for appellees.

JUSTICE GEIGER delivered the opinion of the court:

Richard Lucas, John Helander, and Norma Helander (the plaintiffs) appeal from the order of the circuit court of Du Page County granting summary judgment in favor of defendant Ogilvie & Taylor Securities Corporation (Ogilvie). In their complaint, the plaintiffs alleged violations of the Illinois Securities Law of 1953 (the Act) (815 ILCS 5/1 *et seq.* (West 1994)) and sought rescission of their purchase of certain units in a limited partnership. The trial court ruled that the plaintiffs' action was barred under the applicable statute of limitations and that any misconduct committed by Ogilvie had been negated by the plaintiffs' failure to exercise reasonable diligence in deciding to invest in the subject limited partnership. The plaintiffs appeal, arguing (1) that the action was not time-barred, as it had been initiated within three years from the time the alleged violations were first discovered; and (2) that genuine issues of material fact existed as to whether the partnership's prospectus contained material misrepresentations and omissions in violation of the Act. We affirm in part, reverse in part, and remand for further proceedings.

On December 12, 1988, the plaintiffs each signed subscription agreements for the purchase of units in a limited partnership known

as the Downtown Greenville. Investors Limited Partnership (the partnership). Lloyd DeJong, an agent for Ogilvie, had recommended the partnership to the plaintiffs as an investment opportunity. Lucas purchased one unit in the partnership for $50,000; the Helanders purchased one-half of a unit for $25,000. Prior to their respective purchases of these units, each of the plaintiffs received a private placement memorandum (PPM), a type of prospectus containing information regarding the limited partnership and the proposed investment.

The subject partnership was organized under the laws of the State of South Carolina, with its principal place of business in Greenville, South Carolina. The partnership was formed on September 22, 1988, as a venture between defendants John T. Snipes and Financial Services of Greenville, Inc. Defendant SSV Securities, Inc., a South Carolina corporation, acted in South Carolina as the partnership's agent and broker for purposes of selling units in the partnership.

According to the PPM received by the plaintiffs, the partnership's purpose was to acquire, own, and operate an office building known as the South Carolina National Bank Building (the building), located in Greenville, South Carolina. The building was to be purchased from the U.S. Shelter Corporation for over $6 million. The partnership property to be purchased was described in the PPM as follows:

> "The Partnership Property consists of an [sic] nine-story office building known as the South Carolina National Bank Building, containing approximately 166,000 square feet of gross area and 150,000 square feet of leasable area, along with certain small adjoining lots consisting of several smaller buildings which the partnership proposes to demolish for the purpose of creating a 'green space' adjoining the office building. The Partnership will be purchasing a leasehold interest in the real property where the building is located and a fee interest (legal title) in the adjoining lots from which the 'Green Space' will be created. *The contract of sale also requires seller to negotiate an option to purchase the leasehold interest and assign that to the Partnership.*" (Emphasis added.)

The plaintiffs believed that the italicized sentence required U.S. Shelter to negotiate an option to purchase the land on which the building stood and that the option would be assigned to the partnership at the time of closing.

An engineering report authored by Michael Crowe, P.E., and dated September 23, 1988, was attached to the PPM received by the plaintiffs. The report had been completed after an inspection of the building was conducted by various engineers with backgrounds in

structures, electrical, piping, heating, ventilation, and air conditioning. The report concluded that the building was structurally, electrically, and mechanically sound and that it had been "very well maintained over its life of approximately 14 years." The report, which outlined specific problem areas on each floor of the building, disclosed no major problems relating to the eighth and ninth floors of the building.

On February 1, 1989, the partnership advised the plaintiffs that it had successfully acquired the building. The partnership, however, did not disclose whether it had acquired an option to purchase the land under the building.

In a letter dated March 2, 1992, Snipes advised the plaintiffs that the partnership was in a "difficult" financial condition. Snipes indicated that a group of California investors had declined to make their final installment of approximately $200,000 because the partnership had failed to secure an option to purchase the land under the building. In his letter, Snipes indicated that the partnership had, in fact, acquired the option, but he did not indicate when the option had been purchased or whether the option would be exercised. Snipes explained that, due to the partnership's poor financial condition, a capital call of $750,000 might be necessary from the partners. The plaintiffs assert that it was not until they received this letter that they learned that the partnership had not secured an option to purchase the land at the time of closing.

In a letter dated July 15, 1992, Ogilvie informed the plaintiffs that it had been unsuccessful in its attempt to secure Alan LeVow as a replacement general partner. A report authored by Alan LeVow, which detailed the multitude of problems associated with the building, was attached to Ogilvie's letter. Of particular concern to LeVow was the deteriorating physical condition of the building. LeVow's report stated:

> "The physical condition of the [building] is poor. The [heating, ventilation and air conditioning] system makes so much noise and vibrates so significantly that it is literally impossible to lease the top two floors of the building, floors 8 and 9. Not surprisingly, these two floors have never been occupied in the 18 years in which the building has been opened. The building manager indicated that it would cost anywhere between $100,000 to $250,000 to correct the noise and ventilation problems. ***
>
> * * *
>
> The building manager also informed me that the building did not meet fire and elevator codes. In fact, she has been on notice for approximately two years from different government officials

about the code violations. She estimates it will take approximately $120,000 to bring the building up to code. She is concerned that if this is not acted upon soon the building could be closed."

It was not until the receipt of this letter that the plaintiffs became aware of the poor physical condition of the building and the difficulty in leasing the eighth and ninth floors. Indeed, based on the engineering report which the plaintiffs received at the time of their initial subscription, they believed that the building was in good structural and mechanical condition.

On October 20, 1992, plaintiff Lucas notified the general partners of his election to rescind his purchase in the partnership and demanded a refund of his $50,000 investment, with interest. On December 1, 1992, the Helanders also notified the general partners of their election to rescind their purchase in the partnership and demanded a refund of their $25,000 investment, with interest. The partnership refused to honor the plaintiffs' rescission election.

On April 28, 1993, the plaintiffs filed a six-count complaint against the partnership, as well as Financial Services of Greenville, Inc., SSV Securities, Inc., Snipes, and Ogilvie. Counts I, III, and V of the complaint were brought on behalf of Lucas, and identical counts II, IV, and VI were brought on behalf of the Helanders. Counts I and II alleged that all of the defendants had violated sections 12(F), (G), (H), and (I) of the Act (815 ILCS 5/12(F) through (I) (West 1994)), by making material misrepresentations and omissions in the PPM regarding the land purchase option and the building's physical condition and leasing history. Counts III and IV were directed against Snipes, the partnership, and Financial Services of Greenville, alleging that they fraudulently induced the plaintiffs to purchase their respective partnership interests. Counts V and VI were directed against Snipes and Financial Services of Greenville, alleging an action for breach of fiduciary duty.

On July 8, 1993, the trial court entered default judgments against Snipes, the partnership, and Financial Services of Greenville. The trial court subsequently entered money judgments in favor of the plaintiffs against these defendants.

On November 4, 1993, the plaintiffs filed an amended complaint. Counts I and II of the amended complaint alleged that Ogilvie, acting through its agent, Lloyd DeJong, was involved in the business of offering, selling, dealing, trading, and marketing the units of the subject limited partnership. The plaintiffs alleged that they each received a copy of the PPM, which contained the misrepresentations and omissions described above. The plaintiffs alleged that they relied on the information contained in the PPM and would not have

purchased an interest in the partnership had they known of the misrepresentations and omissions contained therein. The plaintiffs alleged that Ogilvie's conduct violated sections 12(F), (G), (H), and (I) of the Act (815 ILCS 5/12(F) through (I) (West 1994)) and sought rescission of their purchase of units in the partnership, return of their original investment, plus interest and attorney fees.

On July 17, 1995, Ogilvie filed a motion for summary judgment as to counts I and II of the amended complaint. Ogilvie alleged that the plaintiffs could not establish any material misrepresentations or omissions contained within the PPM that were actionable under the Act. Specifically, Ogilvie argued that the language contained in the PPM was accurate, in that it disclosed that the partnership would only have a leasehold interest in the building and was merely attempting to negotiate an option to purchase the land. Ogilvie also argued that had the plaintiffs exercised reasonable diligence, they would have discovered the leasing problems associated with the building's ventilation system.

Ogilvie also argued that it was entitled to summary judgment because the plaintiffs could not establish that the alleged misrepresentations or omissions contained within the PPM proximately caused their financial loss. Ogilvie argued that proximate causation was a requisite element under the Act and that the plaintiffs were unable to make the appropriate showing. Ogilvie also argued that counts I and II of the amended complaint were time-barred under the Act's limitations provision (815 ILCS 5/13(D) (West 1994)), as the action was not brought within three years from the date the securities were purchased.

In response to the motion for summary judgment, the plaintiffs argued that genuine issues of material fact existed as to whether the PPM misrepresented the partnership's ability to purchase the land under the building. Furthermore, the plaintiffs argued that the PPM contained material omissions because it did not disclose the problems associated with the top two floors of the building. In support of their arguments, the plaintiffs offered the affidavit of Tony Barnett, who had been the building's superintendent since it opened in 1974. In his affidavit, Barnett stated that the building's eighth and ninth floors had been vacant, for the most part, since the building had been opened. He stated that the floors had not been leased because of the noise associated with the air conditioning system. The plaintiffs also relied on Alan LeVow's report of July 14, 1992, which also stated that the top two floors had not been leased because of the noisy ventilation system.

In response to Ogilvie's other arguments, the plaintiffs argued

that the Act did not require a showing of loss causation as the only remedy available to them under the Act was rescission and the return of their original investment. The plaintiffs also argued that the action was properly brought within the three-year limitations period, as they did not have knowledge of the alleged misrepresentations and omissions until 1992, when they had received the letters of Snipes and LeVow.

Following a hearing on the motion, the trial judge granted Ogilvie's motion for summary judgment as to counts I and II of the plaintiffs' amended complaint. Relying on this court's holding in *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 18-20 (1995), the trial court ruled that the existence of extensive cautionary language in the PPM negated the materiality of any misrepresentations or omissions contained therein. The trial judge also held that the three-year statute of limitations applied and that, as a matter of law, the plaintiffs failed to exercise reasonable diligence once they became aware of the violations. The plaintiffs filed a timely notice of appeal.

■ The plaintiffs' first argument on appeal is that genuine issues of material fact existed as to whether the alleged misrepresentations and omissions constituted a violation of the Act. A motion for summary judgment should be granted only when the pleadings, depositions, and admissions on file, together with affidavits, if any, disclose that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Bolingbrook Equity I Ltd. Partnership v. Zayre of Illinois, Inc.*, 252 Ill. App. 3d 753, 764 (1993). In determining whether a moving party is entitled to summary judgment, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Saladino v. Team Chevrolet, Inc.*, 242 Ill. App. 3d 735, 739-40 (1993). Summary judgment should be granted only when the right of the moving party is clear and free from doubt. *Graf v. St. Luke's Evangelical Lutheran Church*, 253 Ill. App. 3d 588, 591 (1993).

In their amended complaint, the plaintiffs allege that Ogilvie violated sections 12(F), (G), (H), and (I) of the Act (815 ILCS 5/12(F) through (I) (West 1994)). These sections proscribe the following conduct:

"F. To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission

to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

H. To sign or circulate any statement, prospectus, or other paper or document required by any provision of this Act knowing or having reasonable grounds to know any material representation therein contained to be false or untrue.

I. To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(F) through (I) (West 1994).

We note that in their appellate brief, the plaintiffs have withdrawn any claimed violation of section 12(H). Therefore, we will not consider any such violation here.

■ The provisions of sections 12(F) and (G) of the Act are patterned after sections 17(a)(2) and (a)(3) of the Securities Act of 1933 (Federal Securities Act) (15 U.S.C. §§ 77q(a)(2), (a)(3) (1988)), and Illinois courts must therefore look to federal case law when interpreting these provisions. *Foster v. Alex*, 213 Ill. App. 3d 1001, 1005 (1991). In order to determine whether a misrepresentation or omission is material for purposes of the Federal Securities Act, federal courts consider whether a reasonable and prudent investor would attach importance to the fact omitted or misrepresented in determining his choice of action in the transaction in question. See *In re Donald J. Trump Casino Securities Litigation—Taj Mahal Litigation*, 7 F.3d 357, 369 (3d Cir. 1993). Materiality is a mixed question of law and fact which is ordinarily left for the jury to determine; therefore, summary judgment is only proper in instances where the alleged misrepresentations or omissions are so obviously unimportant that reasonable minds could not differ as to the question of their materiality. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 48 L. Ed. 2d 757, 766, 96 S. Ct. 2126, 2133 (1976).

■ The plaintiffs argue that the representations contained in the PPM regarding the land purchase option were misleading and untrue, in violation of sections 12(F), (G), and (I) of the Act. As noted above, the plaintiffs specifically complain of the following statement in the PPM:

"The contract of sale also requires seller to negotiate an option to purchase the leasehold interest and assign that to the Partnership."

The plaintiffs argue that this statement was a material misrepresentation because the partnership had not, at the time of closing, obtained any legally recognizable option to purchase the land.

We agree with the trial court that these allegations were barred

under the three-year limitations period provided in section 13(D) of the Act. That provision states:

> "No action shall be brought for relief under this Section *** after 3 years from the date of sale; provided, that if the party bringing the action neither knew nor in the exercise of reasonable diligence should have known of any alleged violation of subsection E, F, G, H, I or J of Section 12 of this Act which is the basis for the action, the 3 year period provided herein shall begin to run upon the earlier of:
>
> (1) the date upon which the party bringing such action has actual knowledge of the alleged violation of this Act; or
>
> (2) the date upon which the party bringing such action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act; but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable." 815 ILCS 5/13(D) (West 1994).

The securities at issue in the instant case were purchased on December 12, 1988. Therefore, under the statutory language noted above, the limitations period for bringing an action expired on December 12, 1991. The instant suit, however, was not filed until April 28, 1993.

The plaintiffs argue that under section 13(D)(1), the limitations period did not begin to run until they had actual knowledge of the alleged misrepresentation regarding the land purchase option. They argue that they did not receive such knowledge until they received Snipes' letter of March 2, 1992, which disclosed that the partnership had not acquired an option to purchase the land at the time of closing.

Pursuant to section 12(D)(2), however, the limitations period begins to run on the date that the party has notice of certain facts, which upon the exercise of reasonable diligence, would result in actual knowledge of the violation. In the instant case, the plaintiffs' alleged understanding regarding the land purchase option was inconsistent with the remainder of the PPM, which stated that the partnership would *not* have any ownership interest in the land. For example, the PPM contained the following statements:

> "The Partnership will be purchasing a *leasehold interest* in the real property where the building is located and a fee interest (legal title) in the adjoining lots from which the 'Green Space' will be created.
>
> ı \* \* \*
>
> The property upon which the building is situated *is owned by South Carolina National Bank* and is subject to a lease which will

be assigned to the Partnership which expires in 2018." (Emphasis added.)

Given the inconsistency between these statements and the plaintiffs' belief that the partnership would be obtaining a land purchase option, the plaintiffs were certainly put on notice of a potential ambiguity contained within the PPM. Had the plaintiffs exercised reasonable diligence after discovering this ambiguity, they would have learned of the status of the land purchase option and whether there had been any actual misrepresentation.

Moreover, we are not convinced that the PPM statement on which the plaintiffs rely actually required the partnership to obtain a land purchase option. That statement reads:

"The contract of sale also requires seller to negotiate an option to purchase the leasehold interest and assign that to the Partnership."

Nowhere in this statement is there any reference to an option to purchase the land under the building; rather, the statement refers to an option "to purchase the leasehold interest." The plaintiffs provide no explanation or authority for their interpretation that an option to purchase the leasehold interest is the same thing as an option to purchase the land. Even assuming that these two terms have the same meaning, the statement presents further ambiguity, as it does not specify whether the option had to be secured prior to the time of closing, nor does it specify whether the deal could proceed without obtaining the option. We therefore find that the statement was sufficiently ambiguous and vague so as to put the plaintiffs on notice of a potential violation at the time they received the PPM. Pursuant to section 13(D)(2) of the Act, the limitations period thus began to run in December 1988, when the plaintiffs received the PPM and purchased the partnership units. Therefore, the limitations period for bringing this claim expired in December 1991, approximately two years prior to the time the instant suit was filed.

■ The plaintiffs next argue that a genuine issue of material fact exists as to whether Ogilvie's failure to disclose the noise problem associated with the top two floors of the building was a material omission in violation of sections 12(F), (G), and (I) of the Act. We agree. At the time of subscription, the plaintiffs were provided an engineering report which described the building's condition as being structurally, electrically, and mechanically sound. The report, which specifically detailed the various problem areas on each floor of the building, disclosed no noise problem associated with the heating and air conditioning system on the top two floors of the building, nor did the PPM disclose any leasing difficulties caused by the noise on these two

floors. The plaintiffs, however, presented evidence in the form of Alan LeVow's July 14, 1992, report, as well as the affidavit of building manager Tony Barnett, which demonstrated that these problems had been both longstanding and severe. Contrary to Ogilvie's contentions, we believe that such evidence may be properly considered pursuant to Supreme Court Rule 191(a) (145 Ill. 2d R. 191(a)). See *Mount Prospect State Bank v. Forestry Recycling Sawmill*, 93 Ill. App. 3d 448, 459-60 (1980).

As set forth above, the standard for determining materiality for purposes of a violation of the Act is whether there is a substantial likelihood that a reasonable investor would consider the omitted material to be important in deciding how to invest. *Trump*, 7 F.3d at 369. In deciding whether to invest in a piece of real property, there is a substantial likelihood that a reasonable investor would consider information relating to the building's physical condition and past leasing history to be important investment considerations. In light of the evidence presented above, we conclude that a jury could reasonably determine that the plaintiffs were misled about the leasing problems associated with the building's noisy ventilation system and that such information would have had a significant impact on their decision to invest.

Relying on this court's decision in *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 18-20 (1995), the trial court concluded that the materiality of the alleged omissions was negated by the extensive cautionary language contained in the PPM. In *Lagen*, the plaintiff alleged violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 1992)) predicated upon misleading and false statements made in the PPM regarding the past performance of the security and the likelihood of future returns. *Lagen*, 274 Ill. App. 3d at 18. This court dismissed the action after noting that the PPM was replete with cautionary language warning potential investors of the risks attendant to ownership of real property, including changes in local governmental rules and fiscal policies, economic conditions, neighborhood values, tenant turnover, competition, shortages, and increased energy costs. *Lagen*, 274 Ill. App. 3d at 19. In view of these warnings, this court held that any allegedly false statements of fact were " 'accompanied by meaningful cautionary statements' which render[ed] reliance on those facts immaterial as a matter of law." *Lagen*, 274 Ill. App. 3d at 20, quoting *Trump*, 7 F.3d at 371.

■ Our decision in *Lagen* was predicated upon the "bespeaks caution" doctrine, which has been developed in a line of federal securities cases. See *Trump*, 7 F.3d at 371-72; *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1414 (9th Cir. 1994); *In re Integrated*

*Resources Real Estate Ltd. Partnerships Securities Litigation*, 850 F. Supp. 1105, 1141 (S.D.N.Y. 1993). The "bespeaks caution" doctrine stands for the proposition that statements made in securities offerings must be analyzed in context. *Worlds of Wonder*, 35 F.3d at 1414. Thus, cautionary language, if sufficiently substantive and specifically tailored to the projections, estimates, and opinions contained in an offering document, can render alleged misrepresentations and omissions immaterial as a matter of law. *Trump*, 7 F.3d at 371-72.

■ Our review of the "bespeaks caution" doctrine leads us to conclude that it is not applicable in the instant case. As articulated by the federal courts, the doctrine applies only to misstatements relating to economic projections, estimates of future performance, and similar optimistic statements contained in the prospectus. *Worlds of Wonder*, 35 F.3d at 1413. The misrepresentations contained in *Lagen* and the federal cases noted above generally consisted of statements relating to promises of future performance. As the cautionary language used in those cases was specifically tailored to the future projections, estimates, and opinions contained in the PPMs, those courts concluded that there had been no actionable misrepresentations.

In the instant case, however, the omissions did not relate to opinions or estimates of future performance, but instead related to an important piece of information relating to the building itself. None of the cautionary language contained in the subject PPM warned the plaintiffs that the engineering reports with which they were provided were inaccurate; nor do we believe that the plaintiffs were under an obligation to travel to South Carolina to ascertain the report's accuracy. The objective of the Act is to protect innocent persons who may be induced to invest their money in speculative enterprises over which they have little control, and the Act must be liberally construed to better protect the public from deceit and fraud in the sale of securities. *Meihsner v. Runyon*, 23 Ill. App. 2d 446, 456 (1960). We therefore conclude that a jury should determine the materiality of the omission and whether there has been a violation of the Act.

Ogilvie argues that summary judgment was proper in the instant case because the plaintiffs presented no evidence that the alleged misrepresentations and omissions proximately caused their losses. Ogilvie argues that a showing of proximate causation is required under the Act and that the plaintiffs' failure to allege and prove this element mandates the entry of judgment on Ogilvie's behalf. The plaintiffs argue that they are not required to allege and prove proximate causation, as it is not a statutorily required element under the Act.

■ Although no Illinois court has addressed this precise issue, several federal courts have discussed the question of proximate causation in the context of the Federal Securities Act. These courts have made a distinction between "transaction causation" and "loss causation." See *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683-84 (7th Cir. 1990); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir. 1988). "Transaction causation" concerns whether the alleged misconduct induced the plaintiff to purchase the security in the first instance; "loss causation" concerns whether the plaintiff would have suffered a financial loss if the facts were what he believed them to be. *LHLC*, 842 F.2d at 931. The focus in these federal cases has been whether the plaintiff must allege and prove both "transaction causation" and "loss causation" in order to assert a claim under the Federal Securities Act.

■ At the very least, the Act's statutory language requires a showing of "transaction causation." Section 12(F) forbids engaging in the sale of a security "which works or tends to work a fraud or deceit upon the purchaser or seller thereof." 815 ILCS 5/12(F) (West 1994). Section 12(G) forbids the gaining of money through the sale of a security "by means of any untrue statement of a material fact or any omission to state a material fact." 815 ILCS 5/12(G) (West 1994). Section 12(I) forbids the employment of any scheme or artifice to defraud "in connection with the sale or purchase of any security." 815 ILCS 5/12(I) (West 1994). The plaintiffs do not dispute they are under a burden to show "transaction causation," and, as we have already discussed, they have sufficiently met this burden in regard to the noisy ventilation system so as to preclude summary judgment. Therefore, we will turn our attention to the question of whether plaintiffs must show "loss causation."

■ The United States Court of Appeals for the Seventh Circuit has held that a plaintiff is required to prove both "transaction causation" and "loss causation" in order to bring an action under Rule 10b—5 of the Securities and Exchange Commission (SEC) (17 C.F.R. § 240.10b—5 (1996); 15 U.S.C. § 78j (1991)). *Bastian*, 892 F.2d at 686. In *Bastian*, the court affirmed the dismissal of a Rule 10b—5 claim due to the plaintiffs' failure to plead loss causation, commenting:

> "The plaintiffs alleged that they invested in the defendants' limited partnerships because of the defendants' misrepresentations, and that their investment was wiped out. But they suggest no reason *why* the investment was wiped out. They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one." (Emphasis in original.) 892 F.2d at 684.

The *Bastian* court explained that when an investment fails due to a cause other than the alleged misrepresentation, such as an economic downturn, "the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages." *Bastian*, 892 F.2d at 685. The policy underlying this rule of law is that there is "[n]o social purpose [to] be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation." *Bastian*, 892 F.2d at 685.

Relying on *Bastian*, Ogilvie argues that a similar rule should be applied to actions brought under the Act and that the plaintiffs should be required to prove "loss causation." The plaintiffs, however, argue that *Bastian* is inapplicable to the instant case due to the statutory differences between Rule 10b—5 and the Act. While Rule 10b—5 has been interpreted to provide plaintiffs a private right of action for damages based on common-law fraud and tort (*Bastian*, 892 F.2d at 683), the only cause of action provided under the Act is for rescission (815 ILCS 5/13 (West 1994)). Since the rescission remedy provided by the Act is statutory, rather than predicated on common-law tort, the plaintiffs argue that the Act does not require a showing of "loss causation."

As Ogilvie notes, the language of section 12 of the Act closely parallels the language of Rule 10b—5 (*Norville v. Alton Bigtop Restaurant, Inc.*, 22 Ill. App. 3d 273, 279 (1974)). Both provisions cover the same violations and seek to protect innocent investors who are induced to invest in highly speculative securities. See *Norville*, 22 Ill. App. 3d at 280. We note, however, that the remedies provided by the two provisions are not the same. *Norville*, 22 Ill. App. 3d at 280. In *Bastian*, the Seventh Circuit noted that Rule 10b—5 is not a complete scheme for remedying securities fraud; although the rule details what conduct is proscribed, it does not provide a statutory cause of action or right to damages for its violation. *Bastian*, 892 F.2d at 683. Due to this lack of a statutory cause of action and remedy, federal courts have interpreted Rule 10b—5 to impliedly authorize the creation of a federal common-law action for securities fraud akin to that of common law fraud. *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9, 30 L. Ed. 2d 128, 134 n.9, 92 S. Ct. 165, 169 n.9 (1971); *Bastian*, 892 F.2d at 683.

Therefore, federal courts have relied heavily on the elements of common-law fraud and other intentional torts in creating a cause of action under Rule 10b—5. *Bastian*, 892 F.2d at 683. Because plaintiffs are required to demonstrate proof of harm (*i.e.* "loss causation") in

order to state an action for common-law fraud, the federal courts have also required proof of this element for an action predicated upon a violation of Rule 10b—5. *Bastian*, 892 F.2d at 685; *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549-50 (5th Cir. 1981); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380-81 (2d Cir. 1974). For this same reason, Rule 10b—5 plaintiffs are entitled to civil damages for conduct that violates the rule. *Bastian*, 892 F.2d at 683.

Our review of the Act, however, leads us to conclude that it is to be interpreted and applied in a different manner. Unlike Rule 10b—5, sections 12 and 13 of the Act provide a complete statutory scheme for determining what type of conduct is proscribed and what type of remedy is available. These provisions expressly provide a statutory cause of action which is distinct from common-law fraud. Unlike their federal counterparts, Illinois courts have not interpreted actions brought under the Act to be based in common-law fraud or tort. Furthermore, the only remedy available under the Act is rescission (815 ILCS 5/13 (West 1994)); unlike an action for common law fraud, the Act makes no provision for damages. *Reshal Associates, Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1236 (N.D. Ill. 1990). As the State legislature has provided a complete statutory scheme to remedy securities fraud, which is wholly independent of conventional common law causes of action and remedies, we are bound to give effect to the plain language of the Act without resorting to other aids for construction. See *Envirite Corp. v. Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 216-17 (1994).

 Section 13(A) of the Act provides that "[e]very sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser." 815 ILCS 5/13(A) (West 1994). Under the Act's plain language, such a remedy vests at the time the alleged act of misrepresentation, fraud, or deceit is committed in violation of sections 12(F), (G), and (I). *Hess v. I.R.E. Real Estate Income Fund, Ltd.*, 255 Ill. App. 3d 790, 793, 804 (1993). Sections 12(F), (G), and (I) contain no statutory requirement that the plaintiffs prove that Ogilvie's conduct caused the decline in value of their investment and their corresponding financial loss. Nor is this court aware of any Illinois case which has required a plaintiff to prove "loss causation" under the Act or which has interpreted the Act to be analogous to an action for common-law fraud or tort. Lacking any express statutory language or other authority which requires that the plaintiffs prove "loss causation," we decline to impose such a requirement.

 We also conclude that the three-year limitations provision contained in section 13(D) does not bar an action predicated upon the

building's noisy ventilation system. Although the instant action was filed three years after the purchase of the securities, the limitations period did not begin to run until the plaintiffs had actual knowledge of the misrepresentations or were otherwise made aware of facts, which in the exercise of reasonable diligence, would have resulted in actual knowledge of the violation (see 815 ILCS 5/13(D)(1), (D)(2) (West 1994)). The plaintiffs did not have actual knowledge of the omissions until they received Alan LeVow's report on July 15, 1992; nothing contained in the PPM or other correspondence received by the plaintiffs would have put them on notice of the nature and extent of the building's leasing difficulties. Therefore, we conclude that the instant action had to be brought on or before December 12, 1993, the day on which the five-year repose period expired under section 13(D)(2). As the original complaint was filed on November 4, 1993, the allegations contained therein relating to the omissions regarding the building's physical condition and past leasing history are not time-barred.

For the foregoing reasons, that portion of the order of the circuit court of Du Page County granting Ogilvie's motion for summary judgment as to the allegations regarding the land purchase option is affirmed; that portion of the order granting Ogilvie's motion for summary judgment as to the allegations regarding the failure to disclose the building's leasing difficulties is reversed; and the cause is remanded for further proceedings consistent with this decision.

Affirmed in part and reversed in part; cause remanded.

DOYLE and THOMAS, JJ., concur.