2016 IL App (1st) 150614

FIRST DIVISION
April 25, 2016

No. 1-15-0614

| | | |
|---|---|---|
| YOON JA KIM, KWANG LIM RAH, JOHN KIM, KEVIN CHO, YOUNG PARK, and HYON AI KIM, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| | ) | No. 13 L 009444 |
| v. | ) ) | |
| JAMES JH SONG and WAN HWI LEE, | ) ) | Honorable Margaret Ann Brennan, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Cunningham and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs brought suit against defendants seeking to recover damages and to rescind certain stock purchase transactions, alleging that defendants made false oral representations about the stock and the corporation. The circuit court granted defendants' motion to dismiss the complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)) and allowed plaintiffs to amend their complaint. Plaintiffs subsequently filed a first amended verified complaint alleging, *inter alia*, that defendants committed common-law fraud (count I), violations of the Illinois Securities Law of 1953 (815 ILCS 5/1 *et seq.* (West 2012)) (count III), and violations of Regulation D (see 17 C.F.R § 230.500 *et seq.* (2012)) (count IV).

Defendants filed a section 2-615 motion to dismiss all of the counts in the amended complaint, which the court granted. Plaintiffs were given leave again to amend the complaint, but declined to do so. Only the claims set forth under counts I, III and IV of the first amended verified complaint are at issue in this appeal. For the following reasons, we reverse the trial court's dismissal of count I, and affirm its dismissal of counts III and IV.

¶ 2                                     BACKGROUND

¶ 3                              A. The Original Complaint

¶ 4     On August 22, 2013, the two original plaintiffs in this action, Yoon Ja Kim (Yoon) and Kwang Lim Rah (Rah), filed a verified seven-count complaint against defendants, James Jh Song (Song) and Wan Hwi Lee (Lee). The various common law and statutory claims asserted in the complaint purported to stem from a stock offering and plaintiffs' purchases of shares in the stock. Plaintiffs alleged that defendants solicited them to purchase shares of stock in American Metro Bancorp, Inc. (AMB), an Illinois corporation doing business as American Metro Bank in Chicago, for the purpose of acquiring a controlling interest in AMB to set up a new Korean bank. Plaintiffs further averred that they tendered separate payments to defendants for shares of the AMB stock and their proportionate share of attorney fees that defendants claimed would be necessary to the Korean bank project. According to the allegations in the complaint, defendants made oral representations to plaintiffs that defendants knew to be false, and omitted or concealed information that should have been disclosed to plaintiffs. In response, defendants filed a section 2-615 motion to dismiss the complaint. The circuit court granted this motion, but allowed Yoon and Rah to replead the complaint and to include additional plaintiffs.

¶ 5                          B. First Amended Verified Complaint

¶ 6     On March 27, 2014, Yoon and Rah filed a first amended verified complaint and added the following as plaintiffs in the suit: John Kim (Kim), Kevin Cho (Cho), Young Park (Park),

and Hyon Ai Kim (Hyon). According to the first amended verified complaint,[1] defendants "Song and Lee are widely known in the Korean community as successful businessmen and owners of the City Sport stores" throughout the Chicago area. Around January in 2010, defendants began soliciting Korean investors, including plaintiffs, to purchase shares of AMB stock.[2] Most of the plaintiffs were initially contacted by defendants, who explained that if the investors purchased enough shares to acquire a controlling majority interest in AMB, they could create a Korean bank. Many of the plaintiffs were already acquainted with one or both of the defendants prior to this initial contact, either as members of the same runners club or through other acquaintances in their local Korean communities.

¶ 7                     1. Defendants' Representations to Plaintiffs

¶ 8     According to the general allegations and "Statement[s] of Fact" specific to each of the plaintiffs, Lee and/or Song made the following representations to them during either an initial phone conversation or in-person meeting: the subscribers would be "investing in a Chinese bank, AMB" by acquiring a majority interest in AMB stock, so as to "overtake the operation of [the bank] and thereby open a Korean bank"; this new bank would be "like Foster Bank" (which, purportedly, was "the only other Korean-operated bank in Illinois with branches throughout the Chicago and Chicago suburban areas"); and the project involved "purchasing a building which used to be a bank building." Song also represented that he had "successful business and investment experience" and that this project would allow investors to "all comfortably retire and

---

[1] In addition to the general allegations that are common to all of the plaintiffs' claims in this suit, the first amended verified complaint also sets forth six individual "Statement[s] of Fact" for each of the plaintiffs regarding allegations specific to his or her stock purchase.

[2] Yoon and Rah, the original plaintiffs in this action, were not contacted by defendants about the stock offering until some time around April through June of 2011.

enjoy retirement life." Lee told some of the plaintiffs "there was no chance of a failure because they had carefully evaluated the plan."

¶ 9    In March 2010, shortly after the initial solicitation contact with defendants, all of the plaintiffs (with the exception of Yoon and Rah) were invited to attend an "investors meeting" at a City Sports store located in Chicago.[3] Approximately 30 to 40 Korean individuals attended this meeting, at which both defendants were present, along with some of their business associates. Song started the meeting by giving a "speech" to the attendees about the project, and explained " 'they' were investing in a Chinese bank, AMB, which 'they' could take over at a 'cheap price.' " Song stated that "by acquiring 51 shares of AMB stock, they could do anything they wanted with AMB" and open "a Korean bank *** 'like Foster Bank.' " At the end of the meeting, the attendees were given an "information sheet" to complete, which included providing their names, addresses and the number of shares of AMB stock that they each intended to purchase.

¶ 10                    2. Plaintiffs' Purchase of AMB Stock

¶ 11    Plaintiffs alleged that each of them ultimately purchased shares of AMB stock at the subscription price of $10 per share. In addition, each also contributed an additional sum of money for legal fees that defendants represented would be incurred for legal services in connection with opening a Korean bank. In the first amended verified complaint, each plaintiff also alleged certain facts that were personal and specific to his or her own purchase of the AMB stock (along with the payment for attorney fees) and the circumstances of defendants' solicitation and representations in connection with that purchase.

¶ 12    Kim alleged that after the March 2010 investors meeting, Song called his wife to urge her and Kim to purchase shares of AMB stock. Kim stated that, "[r]elying on representations of Lee

---

[3]    As previously explained, Yoon and Rah were not initially solicited until a year later, around April to June of 2011. Therefore, neither of them were invited to, nor did they attend, the March 2010 meeting.

and Song, and trust they had *** [he and his wife] decided to make the investment" and gave Song a check in the amount of $100,000 on March 18, 2010. After Song called them about the attorney fees, Kim gave him a second check for $15,000 for said fees. Kim had no contact with defendants or AMB, nor did he receive any documentation from them, after he delivered the checks to Song. In August 2011, after many of the investors had complained about the lack of contact and information from defendants and AMB, Lee and Song arranged for an investors meeting at Kim's restaurant in Mount Prospect. A few weeks later, Kim received a copy of his stock certificate for his AMB shares in the mail.

¶ 13    Cho alleged that he received a call from Song soon after the investors meeting, and agreed to purchase 5000 shares. On March 17, 2010, while they were at a runners club meeting, Cho gave Song a check for $50,000 and a second check for $10,000. He had no contact with AMB and received no documentation from anyone following his March 2010 payments to Song, until sometime in August 2011, when he received his stock certificate in the mail from AMB, shortly after the investors met at Kim's restaurant.

¶ 14    Park alleged that he and his wife Keeim knew Lee from their runners club. Keeim called Lee after learning that he was "gathering investors to build a Korean bank." While attending the March 2010 investors meeting, Park saw other attendees writing checks for their subscriptions and "was intrigued by the idea of becoming a partner with Song and Lee in a bank business." He agreed to invest $100,000 "[i]n reliance on [d]efendants' representations and representations of other speaker at the meeting," and gave Song a check for $100,000 on April 1, 2010. A month later, Park gave him another $15,000 check for attorney fees. Park complained about the lack of any contact or documentation from AMB during a meeting with defendants in August 2011. Within a couple of weeks, he received a form letter from AMB asking for a $200 payment for his stock certificate. He refused to pay the fee and did not receive his certificate.

¶ 15   Hyon alleged that Lee told her about the Korean bank project during a runners club meeting on March 15, 2010.  Lee represented that AMB shares would jump from $10 per share to $20 or $30 per share within a year—like Foster Bank, and that "substantial arrangements were already made including scouting of bank staffs from Foster Bank and purchase of a building at Waukegan Avenue." Lee "assured [her] that *** City Sports would guarantee the reimbursement if the investment would go bad." Hyon alleged that, in "[t]rusting Lee and Lee's representations, Hyon and her husband agreed to purchase 10,000 shares."  On March 20, 2010, she gave Lee a cash payment in the amount of $100,000 and later gave another cash payment of $15,000 for attorney fees.[4]  She was neither contacted by AMB, nor given any documentation about her purchase of AMB stock, until August 2011, when she received, by mail, her stock certificate and a blank copy of a document entitled "Subscription Materials."

¶ 16   Rah alleged that in April 2011, Song called him and asked to meet with him.  During their meeting, Song told him about "a Chinese bank on the market which 'they' could purchase at a 'cheap' price" and that "by acquiring majority shares in the Chinese bank, they could open a Korean bank." Song also told Rah that a $100,000 investment would allow him to "become a major shareholder in the bank."  On June 20, 2011, Rah gave Song a check for $50,000 for AMB stock and a second check for $10,000 in attorney fees.  In August 2012, after he had not received any documentation for his stock purchase for over a year, Rah contacted AMB to complain.  A few weeks later, his stock certificate arrived in the mail.  In December 2012, Rah was invited to AMB's company year-end party at the Metro Bank in Chinatown, Chicago. While he was at the party, he learned that the price per share of AMB stock had fallen from $10 to about 80 cents and that there had been a stock split.

---

[4]   According to plaintiffs' allegations in the complaint, Hyon's cash payment of $100,000 for the stock shares was later substituted with a check payable to AMB in the same amount.

¶ 17    Yoon alleged that Lee, whom she knew from her runners club meetings, visited her in person on June 10, 2011 and explained the plan to acquire a controlling interest in AMB for purposes of opening a Korean bank. According to Yoon, "Lee further represented that he himself invested $400,000 and that their mutual acquaintance, a Mr. Kwon, already invested $100,000." Yoon alleged she "was influenced by this in making her decision regarding her investment," and "[r]elying on Lee's representations, [she] agreed to invest $20,000."  The next day, Lee met with Yoon and took her cash payment of $20,000 for the AMB stock. He met with her again the following day to collect a payment of $3,000 for attorney fees. Yoon did not hear from AMB or Lee for over two years afterwards, and whenever she tried to contact Lee, he avoided her calls. In December 2012, Yoon learned that the value of the AMB share had dropped from $10 to about 85 cents.  Following an in-person confrontation Yoon had with Lee in July 2013, Song visited Yoon and gave her "certain documents including an AMB stock certificate for 2,000 shares which was issued to 'James JH Song and Jane Nan Song' on 9-3-10." [5]

¶ 18    In addition to the specific allegations above, all of the plaintiffs alleged that: (1) they were never provided with any information regarding the "status" of the attorney's services or the attorney fees that they paid; (2) they were never furnished with any "written disclosure material" pertaining to AMB stock or AMB prior to their respective purchases of the stock shares; (3) they were never told (by either defendant) that AMB stock was an unregistered stock; and (4) they were never asked about their (or their spouses') personal "wealth or income" or about their financial circumstances.

---

[5]    This certificate indicated that Song had assigned and transferred it to Yoon on August 22, 2011. Another certificate bearing the same certificate number was issued on July 30, 2013 from AMB to Yoon.

¶ 19                              3.  Claims Asserted in Counts I, III, and IV

¶ 20    Count I purported to allege an action based on common-law fraud, and set forth 16 specific oral representations that defendants purportedly made to one or more of the plaintiffs prior to their purchases of the AMB stock. After identifying each representation, plaintiffs alleged that it "was false."  A few examples follow:

> [118] Defendants' representation to the Plaintiffs that they were soliciting Korean investors for investments in order to acquire majority shares for AMB was false.

> [119] Defendants' representation to the Plaintiffs that they were planning to acquire majority shares of AMB in order to set up a Korean bank was false.

> [122]  Lee's representation to Hyon that substantial arrangements were made to open a Korean bank, such as purchasing of a building at Waukegan and scouting of bank staffs was false.

> [124] Song's representation at the "investment explanation meeting" that we would all comfortably retire from the Korean bank project was false.

> [128]  Lee's representation to Hyon that the stock price would jump to $20 or $30 dollars a year, like what happened to Foster Bank was false.

¶ 21    Plaintiffs next alleged that these representations "were false and they were known by the defendants, and each of them, to be false at the time they were made."  They then stated that "[s]aid false representations were made with the intent to deceive and defraud plaintiffs." Plaintiffs alleged that the representations about purchasing a building, securing staff to work at the bank, and hiring attorneys "were made with the intent to make [defendants'] false

representations about building another Korean bank *** sound believable." The "real purpose" of defendants' representations, according to plaintiffs, was not to build another Korean bank; they were, instead, "a part of their scheme to sell AMB stock to [p]laintiffs."

¶ 22    Plaintiffs further alleged in count I that they reasonably relied on defendants' representations, based on their relationships through the runners club activities; defendants' widely publicized reputation as skilled businessmen; and the success story of the Foster Bank. Additionally, plaintiffs asserted that defendants' false statements were "material" because "if not for the false representations, plaintiffs would not have purchased AMB stock and consequently, would not have paid the questionable attorney's fee." In their demand for relief, plaintiffs requested $488,000 in compensatory and consequential damages; interest, attorney fees and court costs; and a reservation of the right to amend their prayer to request punitive damages.

¶ 23    Count III purported to allege a claim under the Illinois Securities Law of 1953 (Securities Law) (815 ILCS 5/1 *et seq.* (West 2012)). Plaintiffs alleged that defendants' sale of the AMB stock constituted a "sale of 'securities' for purposes of Section 2.1" under the Securities Law (815 ILCS 5/2.1 (West 2012)), and that defendants violated multiple sections of the state statute by "conceal[ing] material facts regarding AMB and AMB stock" with the "intent that [p]laintiffs rely thereon in determining whether to make the investment." Specifically, plaintiffs claimed, defendants violated sections 4(H), 12(F), 12(G), 12(I), and 14(B-10) of the Securities Law (815 ILCS 5/4(H), 12(F), 12(G), 12(I), and 14(B-10) (West 2012)). As relief, plaintiff requested rescission of the stock purchase transactions and all damages, plus expenses and costs of suit, allowed under section 13 of the Securities Law. See 815 ILCS 5/13 (2012).

¶ 24    Count IV purported to allege a claim for violation of multiple Rules under Regulation D (see 17 C.F.R § 230.501 *et seq.* (West 2012)). Plaintiffs alleged that defendants did not provide them with "any written disclosure material regarding AMB and AMB stock prior to [the sale]

transactions" and that defendants sold them the "AMB stock without signed subscription agreements, and irrespective of the specific term of the minimum subscription amount of 10,000 shares." Plaintiffs alleged that defendants violated the requirements established under sections 230.502(b) and 230.502(c), and rules under Regulation D "by failing to provide disclosure documents prior to sale; by selling AMB stock to purchasers who were not accredited investors; and by selling the stock through general solicitation." 17. C.F.R. §§ 230.502(b), 230.502(c) (2012). Plaintiff prayed for the same relief as that asked in count III.

¶ 25                                  4. The Subscription Agreement

¶ 26    Attached to plaintiffs' first amended verified complaint, among other exhibits, is a copy of a document entitled "Subscription Materials for American Metro Bancorp, Inc. the Holding Company for America Metro Bank" ("Subscription Materials"). The exhibit, Subscription Materials, is comprised of two parts: a subscription agreement and a confidential investor questionnaire. The last page of the subscription agreement contains a block signature section for the subscriber to execute, and includes blank spaces where the subscriber, whether an individual or an entity, must provide an address, telephone number and social security number or tax identification number.

¶ 27    Despite their allegation in count IV that defendants sold them AMB stock without obtaining signed subscription agreements, plaintiffs nonetheless acknowledged in their complaint that the agreement expressly stated that the AMB stock was being offered without registration with the Securities and Exchange Commission (SEC). Specifically, the pertinent language is set forth in section 2(a) of the subscription agreement, entitled "Representations and Warranties of Subscriber," and states the following:

> "(a) Subscriber understands and acknowledges that the Shares will
> be sold by the Company without registration under the Securities Act of

1933, as amended (the 'Securities Act'), in reliance on the exception from federal and state registration set forth in, respectively, Rule 506 of Regulation D promulgated under Section 5 of the Securities Act ("Regulation D") by the Securities and Exchange Commission (the SEC) and Section 18 of the Securities Act and similar exemptions under applicable state law."

¶ 28    We note, for purposes of our analysis later, the language contained in one other provision of the subscription agreement. Section 2(g) of the subscription agreement states the following:

"(g) The Subscriber acknowledges that the Company has given the Subscriber the opportunity to ask questions of, and receive answers from, the Company's officers, employees and representatives concerning the terms and conditions of the offering of the Shares, and to obtain additional information reasonably available to the Company and any persons acting on the Company's behalf necessary to verify the accuracy of the information contained in the Memorandum, and the Subscriber has received all of the information he or she has requested to the extent such information is reasonably available to the Company. The Subscriber requires no additional information to fully evaluate the merits and risks of a prospective investment in the Company, and acknowledges that he or she has not relied upon, in entering into this Subscription Agreement, any representation, warranty, promise or condition not specifically set forth in this Subscription Agreement."

¶ 29                          C.  Motion to Dismiss

¶ 30    In May 2014, defendants filed a motion to dismiss the first amended verified complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)).[6] Defendants argued that plaintiffs' purported fraud claim under count I should be dismissed even where the factual allegations are construed as true under a liberal construction most favorable to plaintiffs, because

---

[6]    The first amended verified complaint contained five counts, all of which were dismissed pursuant to section 2-615. Only three counts, counts I, III and IV, are at issue on appeal.

the allegation lacked the pleading specificity required for a claim of common-law fraud. Defendants also argued that the Securities Law claim under count III and the federal Regulation D claim under count IV both warranted dismissal also as a matter of law because, under *Greer v. Advanced Equities, Inc.*, 2012 IL App (1st) 112458, and *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450 (2004), plaintiffs cannot allege justifiable reliance on defendants' oral representations where they signed an agreement, *i.e.,* the subscription agreement, which contains a non-reliance disclaimer. Attached to their motion to dismiss are copies of plaintiffs' executed Subscription Agreements. Here, defendants maintain, plaintiffs have expressly acknowledged, under section 2(g) of the subscription agreement, that they did not rely on "any representation, warranty, promise or condition not specifically set forth" in the document when they agreed to the stock purchase transaction by signing the subscription agreement.

¶ 31 In response, plaintiffs argued that they stated a claim for common-law fraud with sufficient specificity in count I. With respect to defendants' argument that counts I, III and IV are barred by the nonreliance clause contained in the subscription agreement, plaintiffs argued first that defendants "never delivered any disclosure material," including the subscription agreement, to plaintiffs prior to their purchase of the stock. Notwithstanding this defect, plaintiffs also argued that the subscription agreement lacks "a signature page for AMB" and, therefore, plaintiffs' execution and delivery of "[the] signed [S]ubscription [A]greement was an *offer*, subject to acceptance by AMB." (Emphasis added.) According to plaintiffs, AMB has not technically "accepted" plaintiffs' offer to purchase the shares under section 1(d) of the subscription agreement because "[a]cceptance of the subscription occurs when a letter indicating such acceptance and signed by an officer of the Company has been deposited in the U.S. mail." As a result, plaintiffs maintained, the stock purchase transactions "never closed," "[a]cceptance never occurred, and therefore, there was no disclaimer [by plaintiffs]."

¶ 32    In their reply, defendants point out that almost all of the plaintiffs, except for Kim, did receive stock certificates signed by the president of AMB, and that such documentation suffices as evidence of AMB's acceptance of plaintiffs' "offer" under the subscription agreements.

¶ 33    On September 26, 2014, the circuit court granted defendants' motion to dismiss all five counts of the first amended verified complaint. The court held that "despite the extensive 'allegations of fact' " that plaintiffs set forth in their complaint, count I still failed to properly allege a fraud claim.  With respect to the securities claims under counts III and IV, the court "agree[d] with [d]efendants' reading of *Greer*, that the non-reliance provisions of the [Subscription] Agreements bar their claims." Plaintiffs then filed a motion to reconsider, arguing that the court erred in dismissing counts III and IV because "*Greer* did not hold that *any* action alleging securities law violation is barred by [a] nonreliance agreement." (Emphasis in original). On January 16, 2015, the court denied plaintiffs' motion to reconsider, finding that "Illinois law is clear that a nonreliance clause of an agreement will bar Securities Law claims" (citing *Tirapelli*, 351 Ill. App. 3d 450 (2004)). The court also granted plaintiffs leave to file a second amended complaint.

¶ 34    Plaintiffs declined to file a second amended complaint and, instead, acknowledged their waiver of the right to amend and filed a "Motion For Final Order," requesting that the court enter a finding "that the Order of January 16, 2015 is appealable as is" or, alternatively, amend the order to include Rule 304 language. Ill. S. Ct. R. 304 (eff. Feb. 26, 2010). On February 9, 2015, the court amended its January 16 order by dismissing counts III and IV with prejudice and allowing plaintiffs 30 days from the date of the order to appeal. Plaintiff again moved to amend the court's February 9 order, asking the court to recognize their "right to appeal on all [five] counts of the complaint" that were dismissed pursuant to the September 26 order. On February 23, 2015, the court entered an order stating, "On plaintiff's motion, it is hereby ordered to amend

the order of Feb 9, 2015 as follows: 1. All matters are dismissed with prejudice effective Feb 9, 2015."

¶ 35                                    JURISDICTION

¶ 36    Plaintiffs filed their notice of appeal on March 3, 2015. Initially, defendants contend that this court lacks jurisdiction to hear plaintiffs' appeal because the notice of appeal includes a substantive defect, *i.e.*, references to the February 9, 2015 order when, in fact, the final judgment was entered in the order dated February 23, 2015. A notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." Ill. S. Ct. R. 303(b) (eff. May 30, 2008). "Mere technical defects in form, as opposed to substance" will not be considered fatal. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 189 (1991); *Jackson v. Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago*, 293 Ill. App. 3d 694, 698 (1997). A notice will be considered sufficient for jurisdictional purposes as long as it "fairly and accurately sets out the judgment complained of and the relief sought, advising the successful litigant of the nature of the appeal." *Fitch v. McDermott, Will & Emery, LLP*, 401 Ill. App. 3d 1006, 1014 (2010).

¶ 37    In the notice, plaintiffs stated that they appealed from the court's "Feb. 9, 2015" order and were seeking to "Reverse judgment on Count I (Fraud); Count III (Violation of Illinois Securities Law); and Count IV (Violations of Regulation D)." The February 23 order unequivocally indicates that the February 9 order was being amended so as to reflect the court's dismissal of "all" matters with prejudice "effective Feb. 9, 2015." The notice of appeal fairly and accurately apprises defendants of plaintiffs' intent to appeal the dismissal of counts I, III, and IV of their first amended complaint. Defendants are not prejudiced by the technical mistake in the notice. Accordingly, we have jurisdiction to consider the merits of plaintiffs' appeal.

¶ 38                                    ANALYSIS

¶ 39    Plaintiffs contend that the circuit court erred in dismissing count I because they sufficiently stated a cause for common-law fraud and are not barred by any nonreliance clause in the subscription agreement pursuant to the *Greer* decision. They further contend that the court improperly applied *Greer* in dismissing counts III and IV because *Greer* does not apply to the statutory securities claims asserted in this case.

¶ 40    A section 2-615 motion to dismiss challenges the legal sufficiency of the complaint. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 54; *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006).  Such a motion does not raise affirmative factual defenses but alleges only defects on the face of the complaint. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86 (1996). In ruling on a section 2-615 motion, the court must accept as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom. *Id.* The question is whether the allegations of the complaint, when viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *DiBenedetto v. Flora Township*, 153 Ill. 2d 66, 69-70 (1992). "A pleading must show only the possibility of recovery, not an absolute certainty, and it should not be dismissed unless it appears that the pleader in no event would be permitted to recover." *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 160-61 (1986).  A court ruling on a section 2-615 motion "may consider only the allegations of the complaint [citation] and may not consider other supporting material." (Emphasis omitted.)  *Bryson*, 174 Ill. 2d at 91.  We review *de novo* the circuit court's ruling on a section 2-615 motion. *Performance Electric, Inc. v. CIB Bank*, 371 Ill. App. 3d 1037, 1039 (2007).

¶ 41                              A. Count I:  Common-Law Fraud

¶ 42    On appeal, plaintiffs argue that they have sufficiently alleged facts in count I of the first amended verified complaint to support their common law fraud claim. To allege a claim for common-law fraud, a plaintiff must assert sufficient facts to show that: (1) the defendant made a false statement; (2) the defendant knew his statement to be false; (3) the defendant intended for his statement to induce the plaintiff to act; (4) the plaintiff acted in reliance upon the statement being true; and (5) the plaintiff suffered damages due to his reliance on the statement. *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill. App. 3d 759, 771 (2007) (citing *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996)). Moreover, a claim of fraud " 'must allege, with specificity and particularity, facts from which fraud is the necessary or probable inference, including what misrepresentations were made, when they were made, who made the misrepresentations, and to whom they were made.' " *Id.* (quoting *Connick*, 174 Ill. 2d at 496-97).

¶ 43    In count I, plaintiffs specified 16 oral representations made by defendants, either jointly or individually, to either one or more plaintiffs, regarding the stock offering and the plan to acquire a majority interest and to create a Korean bank.  They alleged that Song and Lee purposely misrepresented to plaintiffs that by purchasing a controlling interest in AMB, they would be able to set up a Korean bank similar to Foster Bank, a Korean-operated bank in Illinois well-known in the community.  Defendants told plaintiffs that their investment would enable them to retire comfortably.  Plaintiffs relied on defendants' misrepresentations because Song touted his business and investment experience and Lee assured plaintiffs that there was no chance of failure because defendants had carefully evaluated their plan.  Song and Lee also informed plaintiffs that they had also purchased shares themselves.  Furthermore, plaintiffs alleged that they knew defendants either through a running club or through acquaintances in the local Korean community, which also caused them to rely on defendants' misrepresentations.

They alleged that defendants concocted the scheme, including representations that a building would be purchased and that staff and attorneys would be hired, to "sound believable" to plaintiffs. However, plaintiffs alleged that defendants never intended to build another Korean bank but instead, their intent was to sell AMB stock to plaintiffs. Plaintiffs alleged that without defendants' misrepresentations, they would not have purchased AMB stock or paid the accompanying attorney fees. They requested as damages $488,000, plus attorney fees and costs and a reservation of their right to request punitive damages.

¶ 44    We find that plaintiffs in their complaint alleged with sufficient specificity the misrepresentations made by defendants. We are mindful that at this juncture, plaintiffs are only required to allege sufficient facts, taken as true and construed in the light most favorable to plaintiffs, which may enable them to recover against defendants. *Zimmerman*, 156 Ill. App. 3d at 160. Their factual allegations need not prove their case at this point. Here, the complaint sufficiently alleged that in making their statements, defendants knowingly intended to induce plaintiffs to purchase stock they would not have otherwise purchased, that plaintiffs relied on defendants' expertise and their relationships with defendants for the truth of their statements when plaintiffs purchased the stock, and plaintiffs suffered damages as a result. See *Connick*, 174 Ill. 2d at 496-97 (a "common law fraud complaint must allege, with specificity and particularity, facts from which fraud is the necessary or probable inference, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made"). The trial court erred in dismissing count I of plaintiffs' first amended complaint.

¶ 45    Plaintiffs also alleged in count I that defendants committed fraud based on defendants' statements that they were "getting legal services" in connection with acquiring the controlling interest in AMB and creating the Korean bank. They alleged that they have "never been

provided with any information" about the status of the attorney fees being paid, despite contributing payments to defendants for these purported legal fees. Plaintiffs further alleged that these representations "were false and they were known by the defendants *** to be false at the time they were made" and that the statements were made with the intent to "deceive and defraud plaintiffs." Although the trial court did not explicitly rule on the attorney fees issue, as defendants acknowledge, the trial court's dismissal of count I in its entirely necessarily includes the attorney fees claim since it was alleged as part of count I and included in plaintiffs' prayer for relief as to count I. Therefore, we find that this issue is included in plaintiffs' sufficiently pled common-law fraud claim.

¶ 46    B.    Count III: Violation of the Illinois Securities Law

¶ 47    Plaintiffs next contend that the circuit court erred in dismissing their claims against defendants under count III for alleged violations of sections 4(H), 12(F), 12(G), 12(I), and 14(B-10) of the Securities Law (815 ILCS 5/4(H), 12(F), 12(G), 12(I), 14(B-10) (West 2012)).

¶ 48    1.    *Greer* and the nonreliance clause

¶ 49    In dismissing the claims under count III, the circuit court concluded that under *Greer v. Advanced Equities, Inc.*, 2012 IL App (1st) 112458, plaintiffs were barred as a matter of law from asserting a violation under the statute because of the nonreliance clause contained in the subscription agreement. Plaintiffs argue that the circuit court erred in dismissing count III based on *Greer* because: (1) *Greer* was a decision limited to a particular certified question applying only to common-law fraud claims; (2) plaintiffs signed the nonreliance clause agreement with AMB, not defendants, and therefore the reasoning in *Greer* does not apply; and (3) "*Greer* did not address violation claims under [the] non fraud-based sections of the Illinois Securities Law."

¶ 50    In *Greer*, plaintiffs purchased shares of stock in a company after receiving a private placement memorandum from the defendants that provided details about the company and the

proposed investment. *Id*. In conjunction with the stock purchase, the plaintiffs signed a subscription agreement containing a nonreliance clause, stating that plaintiffs had relied solely on the private placement memorandum in making their decision to purchase the shares, and acknowledging that " 'no representations or agreements (oral or written), other than those set forth in the [private placement memorandum], have been made to the undersigned with respect thereto.' " *Id*. Shortly thereafter, the plaintiffs learned that "certain material statements that [the] defendants had made orally and in writing" regarding the company issuing the stock were "untrue." *Id*. ¶ 3. They sued the defendants, alleging common law fraud based on the defendants' oral misrepresentations. *Id*. The trial court certified the following question for review, which this court considered and answered in the affirmative ( ¶ 1):

> " 'Where a purchaser of securities contractually agrees through a non-reliance clause that it is not relying on any oral representation made in connection with its purchase of the securities, is the purchaser barred as a matter of law from thereafter pleading in an action alleging common law fraud that it relied on oral statements when purchasing the securities?' "

¶ 51    Our analysis of the certified question in *Greer* led us to examine three prior decisions, all involving an agreement containing a nonreliance clause, in which Illinois courts had previously considered a similar issue: *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117 (1995), *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450 (2004), and *Benson v. Stafford*, 407 Ill. App. 3d 902 (2010).  We recognized that *Adler* first established the rule "as a matter of law that the plaintiffs could not have justifiably relied on any of the alleged oral misrepresentations because of the nonreliance clause in the subscription agreement. [Citation.]" *Greer*, 2012 IL App (1st) 112458, ¶ 6. Next, we noted that in *Tripelli*, the court held that the " '[p]laintiffs' reliance was unreasonable as a matter of law' because the nonreliance clause disclaimed any reliance on the

defendants' representations." *Id.* ¶ 7 (quoting *Tirapelli*, 351 Ill. App. 3d at 458). Finally, we observed that in *Benson*, the *Adler* rule "was an 'automatic rule precluding damages for fraud based on oral representations in the presence of a nonreliance clause.' *Id.* ¶ 8 (quoting *Benson*, 407 Ill. App. 3d at 924).

¶ 52    We ultimately concluded in *Greer* that "if a purchaser signs an agreement containing a nonreliance clause that disclaims reliance on any oral representations by the seller, then the purchaser cannot thereafter maintain a cause of action for common-law fraudulent oral misrepresentation. This is a logical rule, given that it is hardly justifiable for someone to rely on something that they have agreed not to rely on, and without justifiable reliance there can be no fraud." *Id.* ¶ 9.

¶ 53    Here, plaintiffs alleged that defendants induced them to invest in AMB by making false representations, among others, that they intended to create a Korean bank by buying enough stock in AMB to gain control. Following *Greer*, we find that plaintiffs cannot now assert that they justifiably relied on defendants' alleged oral representations when they have expressly acknowledged, under section 2(g) of the subscription agreements,[7] that they did not rely upon, "in entering into this Subscription Agreement, any representation, warranty, promise or condition not specifically set forth in this Subscription Agreement."  Similar to the nonreliance clauses at issue in *Greer* and the previous case authorities that we discussed above, the provision in section 2(g) of the subscription agreement bars plaintiffs from asserting a claim now that they justifiably relied on any of defendants' alleged oral misrepresentations prior to their purchase of the shares of AMB stock.  Again, we acknowledge that plaintiffs did not attach signed copies of the

---

[7]    According to the first amended verified complaint, Kim did not sign the subscription agreement. For purposes of this appeal, however, we do not distinguish Kim from the other plaintiffs and consider him to be a "subscriber" under the subscription agreement—to the extent other plaintiffs are, by virtue of his purchase of stock shares issued at the subscription price and the stock certificate reflecting his ownership of 10,000 shares of stock (which was attached to the complaint).

subscription agreements to the first amended verified complaint.  We further note, however, that plaintiffs did incorporate and attach as an exhibit to their complaint an unsigned copy of the subscription agreement, and none of them except Kim deny signing it after receiving a copy of the same as part of the Subscription Materials sometime around August of 2011. They simply argue that they did not sign it prior to purchasing the stock, and that they dispute the legal effect of the executed Subscription Agreement, contending that it was never "accepted" by AMB and therefore is not legally in effect, despite their ownership of the shares through the subscription.

¶ 54                    2. Applicability of *Greer* to Illinois Securities Claims

¶ 55    Plaintiffs argue that *Greer* does not apply to bar their claims under count III because that case did not involve any claims brought under the Securities Law.  We disagree that the rationale of *Greer* does not apply, and find support for our application of the nonreliance clause bar on claims involving reliance in *Tripelli*.  Contrary to plaintiffs' argument, the rationale explained by the *Greer* court is also applicable to bar securities claims brought pursuant to certain sections of the Securities Law, specifically sections 12(F), 12(G), and 12(I). See *Tirapelli*, 351 Ill. App. 3d at 458. As the *Tirapelli* court explained, "sections 12(F), 12(G), and 12(I) of the Illinois Securities Law are modeled after sections 17(a)(1) through (a)(3) of the federal Securities Act," and we may use federal securities fraud case law as an aid to interpret those sections of our state securities statute.  *Id.* at 455.  The court further recognized that reasonable reliance is not only an element of common-law fraud, but also of sections 12(F), 12(G), and 12(I) of the Securities Law, and section 10(b) of the Securities Exchange Act and Rule 10b-5.  *Id.*  (citing 15 U.S.C. § 78j(b) (2000) and 17 C.F.R. § 240.10(b)-5 (2000)).

¶ 56    In *Tirapelli*, the plaintiffs purchased shares of stock and signed a subscription agreement containing a nonreliance clause. *Id*. at 452-53. After losing their investment, the plaintiffs sued defendants for rescission and damages based on alleged violations of sections 12(F), 12(G), and

12(I) of the Securities Law and a common-law fraud claim, alleging they relied on misrepresentations of the defendants. *Id*. at 454. The trial court awarded summary judgment in favor of the defendants, concluding that the nonreliance clause in the signed subscription agreement "made [the] plaintiffs' reliance on the oral representations unreasonable as a matter of law." *Id*. The *Tirapelli* court then observed that "[t]here are sound policy reasons for precluding fraud claims based on oral statements outside the written agreement where the agreement includes a nonreliance clause" and that "the same reasoning applies to the Illinois Securities Law." *Id*. at 457. The court then held that the plaintiffs could not establish the reliance required to sustain a claim under the Securities Law because such reliance on the alleged oral misrepresentations was unreasonable as a matter of law where the plaintiff had acknowledged the nonreliance clause. *Id*. at 458.

¶ 57    Based on *Tirapelli*, we agree with the circuit court's conclusion that plaintiffs cannot allege reasonable reliance and therefore have failed to state a violation of sections 12(F), 12(G), and 12(I) of the Securities Law. See *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 734-35 (a reviewing court may affirm the circuit court's judgment on any basis supported by the record). We rely on the same reasoning with respect to plaintiffs' claim under section 10(b) of the Securities Exchange Act and Rule 10b-5. Similarly, to prevail in a Rule 10b-5 claim, a plaintiff must demonstrate that the defendant: (1) made a misstatement or omission, (2) of material fact, (3) with *scienter*, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused the plaintiff's injuries. *In re Healthcare Compare Corp. Securities Litigation*, 75 F.3d 276, 280 (7th Cir. 1996). See *Tirapelli*, 351 Ill. App. 3d at 457 (citing *Rissman v. Rissman*, 213 F.3d 381, 382-83 (7th Cir. 2000) (barring claim where the plaintiff sued the defendant pursuant to section 10(b) of the Securities Exchange

Act and Rule 10b-5, but nonreliance clause barred him from asserting alleged reliance on the defendant's statement).

¶ 58    In addition, plaintiffs have similarly failed to state a claim pursuant to section 14(B-10) of the Securities Law (815 ILCS 5/14(B-10) (West 2012)). Section 14(B-10) classifies the offense committed by a person who violates sections 12(F), 12(G), or 12(I) of the Securities Law where the offender, in the course of doing so, "induces a person 60 years of age or older to purchase or sell securities" (*id.*); under Section 14(B-10), that offender "is guilty of a Class 2 felony." However, as we found above, plaintiffs failed to state a claim that defendants violated sections 12(F), 12(G), or 12(I) based on the holding in *Tirapelli*. If plaintiffs failed to state a claim based on sections 12(F), 12(G), or 12(I), it naturally follows then that plaintiffs cannot state a claim pursuant to section 14(B-10), which is based on the underlying violation(s) of those enumerated section 12 provisions in the Securities Law. 815 ILCS 5/12 (West 2012).

¶ 59    Finally, plaintiffs point out that in count III of the complaint, they alleged violation of section 4(H) of the Securities Law, a statutory provision that does not require them to allege reasonable reliance as an element of the violation (815 ILCS 5/4(H) (West 2012). Section 4 of the Securities Law governs "Exempt transactions" and provides that the "provisions of Sections 2a, 5, 6 and 7 of this Act shall not apply to any of the following transactions." 815 ILCS 5/4 (West 2012). Subsection (H) details one such exempt transaction, specifically, "[a]ny offer, sale or issuance of a security to an accredited investor [is exempt transaction] provided that such security is not offered or sold by means of any general advertising or general solicitation in this State." Pub. Act 99-182, § 5 (eff. Jan. 1, 2016) (amending 815 ILCS 5/4(H) (West 2014)). An "accredited investor" under the Securities Law is defined in section 230.501 of the Code of Federal Regulations. Pub. Act 99-182, § (eff. Jan. 1, 2016) (adding 815 ILCS 5/2.34); see also 17 C.F.R. § 230.501(5), (a)(6) (2012).

¶ 60    We agree with plaintiffs that section 4(H) does not require reasonable reliance as an element and that, therefore, neither *Greer* nor *Tirapelli* apply to bar plaintiffs' claims under that specific provision of the Securities Law. However, we review the judgment, not the reasoning, of the circuit court. *City of Chicago v. Holland*, 206 Ill. 2d 480, 491 (2003); *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 24. The determination of the circuit court was that plaintiffs failed to properly state Securities Law violations in count III, and plaintiffs have failed on appeal to argue that they properly stated a claim that defendants violated section 4(H). Their only argument with respect to section 4(H) is that "*Greer*'s holding does not apply to the present claim which alleges, among others, that Defendants violated regulatory requirement section, 4(H), a non fraud-based section of the Illinois Act." We will not attempt to discern the grounds for this conclusion where plaintiffs fail to provide any. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (the party's argument "shall contain the contentions of the [party] *** with citation of the authorities and pages of the record relied on"); *In re Marriage of Johnson*, 2011 IL App (1st) 102826, ¶ 25 (observing that "bare contentions that fail to cite any authority do not merit consideration on appeal").

¶ 61    Lastly, plaintiffs also argue that because the Subscription Agreement was an agreement with AMB and not defendants, as the signatory party, the nonreliance clause cannot bar their claims against defendants. Plaintiffs have not cited and we are not aware of any case law to the contrary. As such, we decline to further consider this argument. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (the party's argument "shall contain the contentions of the [party] *** with citation of the authorities and pages of the record relied on"); *In re Marriage of Johnson*, 2011 IL App (1st) 102826, ¶ 25 (observing that "bare contentions that fail to cite any authority do not merit consideration on appeal").

¶ 62    Based on the foregoing, we find that the circuit court properly dismissed count III pursuant to section 2-615 of the Code.

¶ 63                                  C.  Count IV: Violation of Regulation D

¶ 64    Finally, plaintiffs contend that the circuit court erred in dismissing count IV of their complaint because "there is no authority holding that [a] nonreliance clause bars Regulation D violation claims." Because Regulation D is a federal regulation, we consider federal authority for guidance.

¶ 65    Pursuant to the federal Securities Act of 1933:

> "[A]ny offer to sell securities must either be registered with the SEC or meet an exemption. Regulation D (or Reg D) contains three rules providing exemptions from the registration requirements, allowing some companies to offer and sell their securities without having to register the securities with the SEC." U.S. Securities and Exchange Commission, *Regulation D Offerings*, http://www.sec.gov/answers/regd.htm (last visited Jan. 21, 2016).

See also 17 C.F.R. § 500 *et seq*. (2012).

Specifically, it is section 5 of the Securities Act that prohibits the sale of unregistered securities. 15 U.S.C. § 77e (2012). This general prohibition is subject to exemptions set out in section 4(2) of the Securities Act. 15 U.S.C. § 77d (2010). Moreover, "[c]ourts have repeatedly recognized that § 4(2) of the Securities Act, as further elaborated upon in Regulation D, is an affirmative defense to violations of § 5." *Gandhi v. Sitara Capital Management, LLC*, 689 F. Supp. 2d 1004, 1009 (N.D. Ill. 2010).

¶ 66    In their complaint, plaintiffs specifically allege defendants' conduct violated various subsections of rule 502 and rule 506(b) of Regulation D (17 C.F.R. §§ 230.502, 230.506(b)

(2012)).[8] Rule 502 provides that if "the issuer" of Regulation D stock sells securities "to any purchaser that is not an accredited investor," the issuer shall furnish to the purchaser information as dictated by subsection (b)(2) of the rule; the information shall be provided a "reasonable time prior to" the sale and shall include specified financial statement and nonfinancial statement information. 17 C.F.R. § 230.502(b)(1), (b)(2)(i) (2012). In addition, "[a]t a reasonable time prior to the sale of securities to any purchaser that is not an accredited investor, *** the issuer shall advise the purchaser of the limitations on resale in the manner contained in paragraph (d)(2) of this section." 17 C.F.R. § 230.502(b)(2)(vii) (2012). Finally, subsection (d) of Rule 502 provides that "securities acquired in a transaction under Regulation D *** cannot be resold without registration under the Act or an exemption therefrom." 17 C.F.R. § 230.502(d) (2012). Rule 506(b) states that to "qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of" rule 502. 17 C.F.R. § 230.506(b)(1) (2012).

¶ 67    Initially, we acknowledge that a claim based on a violation of the above Regulation D provisions does not appear to require reasonable reliance as an element and, therefore, neither *Greer* nor *Tirapelli* apply to bar these claims. However, we again note that we review the judgment of the circuit court, not the reasoning. *Holland*, 206 Ill. 2d at 491; *Coghlan*, 2013 IL App (1st) 120891, ¶ 24. As to count IV, the circuit court's ultimate judgment was that plaintiffs failed to properly state a claim based on Regulation D violations. Once again, plaintiffs have failed to argue on appeal that they properly stated a claim that defendants violated provisions of Regulation D. They instead argue only that because "Regulation D is *not* a 'federal securities *fraud* count,' " (emphases in original), that *Greer* and *Tirapelli* do not act as a bar to their Regulation D claims. Because plaintiffs failed to argue that they properly stated a claim based on

---

[8]    Plaintiffs actually mislabeled the subsections of Rule 502 which they relied on but, because they directly quoted the subsections, we were able to determine which subsections they intended to cite.

violations of Regulation D, they have forfeited the issue. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (the party's argument "shall contain the contentions of the [party] *** with citation of the authorities and pages of the record relied on"); *Marriage of Johnson*, 2011 IL App (1st) 102826, ¶ 25 (observing that "bare contentions that fail to cite any authority do not merit consideration on appeal").

¶ 68    Nonetheless, count IV fails to state a claim based on a violation of Regulation D, because Regulation D is not a basis for a claim. Regulation D outlines the requirements for an exemption from the registration requirements in section 5 of the Securities Act. See 17 C.F.R. §§ 230.500-230.506 (2012). That a party was exempt from the registration requirements is generally used as an affirmative defense to claims based on alleged section 5 violations. *Gandhi*, 689 F.Supp.2d at 1009; see also *Swenson v. Engelstad*, 626 F.2d 421, 425 (5th Cir. 1980) (noting that the "private offering exemption" in section 4(2) of the Securities Act "is an affirmative defense which must be raised and proved by the defendant"); *Securities & Exchange Comm'n v. Bronson*, 14 F. Supp. 3d 402, 412 (S.D.N.Y. 2014) (finding defendants failed to show as an affirmative defense that the securities at issue were exempt from the section 5 registration requirements pursuant to a Regulation D provision); *ABN AMRO, Inc. v. Capital International, Ltd.*, 595 F. Supp. 2d 805, 833 (N.D. Ill. 2008) (stating that "the burden of proof is on the party claiming the benefit of the exemption" or that "[i]n other words, exemption is an affirmative defense"); *Anastasi v. American Petroleum, Inc.*, 579 F. Supp. 273, 274 (D. Colo. 1984) (noting that an exemption pursuant to section 4(2) of the Securities Act is an affirmative defense to a violation of section 5). Moreover, by its own terms, "Regulation D is available only to the issuer of the securities ***. Regulation D provides an exemption only for the transactions in which the securities are offered or sold by the issuer, not for the securities themselves." 17 C.F.R. § 230.500(d) (2012). This shows that Regulation D is not intended to be used as the basis for a claim; rather, it is

intended to provide a defense against a claim that an issuer of securities violated section 5 of the Securities Act. Not only do plaintiffs not refer to section 5 of the Securities Act in their complaint, but plaintiffs actually titled count IV "violation of Regulation D." Plaintiffs have cited no authority, and our research has revealed no case law, to suggest that a claim can be brought pursuant solely to Regulation D. Furthermore, if plaintiffs were attempting to present a claim based on section 5 violations, they have failed to adequately articulate that in count IV and have failed to provide guidance to us on appeal to understand their complaint. We cannot presume to guess what plaintiffs intended. Accordingly, we find that dismissal of count IV was warranted.

¶ 69                                                   CONCLUSION

¶ 70    For the foregoing reasons, we affirm the judgment of the circuit court dismissing counts III and IV of plaintiffs' first amended verified complaint, but reverse its dismissal of count I. We remand the cause for further proceedings.

¶ 71    Affirmed in part, reversed in part; remanded for further proceedings