RONALD R. TIRAPELLI et al., Plaintiffs-Appellants, v. ADVANCED EQUITIES, INC., et al., Defendants-Appellees.

First District (6th Division)   No. 1—03—2463

Opinion filed July 30, 2004.

Gerald B. Mullin, P.C., of Chicago (Gerald B. Mullin and Richard Larson, of counsel), for appellants.

Joseph E. Tighe, P.C., of Chicago (Joseph E. Tighe, of counsel), for appellee Advanced Equities, Inc.

Burris, Wright, Slaughter & Tom, L.L.C., of Chicago (Darryl Tom, of counsel), for appellees Jack Pressman and OptimalPath Digital Network.

Freeborn & Peters, L.L.P., of Chicago (Michael D. Freeborn, Douglas A. Albritton, and Catherine A. Miller, of counsel), for other appellees.

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiffs Ronald Tirapelli and Michael Webb brought suit against defendants Lee Wiskowski, Jack Pressman, Advanced Equities (Advanced), OptimalPath Digital Network (Optimal), and Telecom Capital Group (TCG) seeking rescission and damages based on alleged violations of sections 12(F), 12(G), and 12(I) of the Illinois Securities Law of 1953 (Illinois Securities Law) (815 ILCS 5/12(F), (G), (I) (West 1998)), as well as common law fraud. Plaintiffs alleged that they

purchased shares of TCG in reliance on oral statements not found in the written agreement for the sale of the shares and that those statements were fraudulent. The trial court granted summary judgment in favor of defendants because the presence of "nonreliance" and "integration" clauses in the agreement made plaintiffs' reliance on oral statements not found in the agreement unreasonable as a matter of law. We affirm.

## BACKGROUND

Plaintiffs each own Ford dealerships and have experience investing in securities. Tirapelli has a net worth of over $5 million and has more than $1 million worth of investments. Webb has approximately $5 million worth of investments and has accounts with three different stockbrokers.

Wiskowski was a founder and executive of Advanced and TCG. TCG retained Advanced to solicit investment in TCG through private placement subscription.[1] When TCG later converted from a limited liability company to Communications Infrastructure Development Corporation (CIDC), a corporation, in an effort to secure investment from institutions not permitted to invest in limited liability companies, Wiskowski served as the president of CIDC. Pressman was a founder, board member and officer of Optimal, a company in which TCG invested.

In March 2000, Advanced broker Ronald Stuppy approached Tirapelli about investing in TCG. Tirapelli had previously invested through Stuppy. Upon Stuppy's suggestion, Tirapelli attended a meeting with Stuppy, Wiskowski and Pressman during which Wiskowski and Pressman explained that TCG was formed primarily to invest in and make loans to "young," technology-oriented companies in exchange for equity in those companies, and that part of TCG's plan was to purchase and renovate property for use by those companies. Pressman also explained that Optimal was created to provide integrated technology infrastructure to commercial and residential properties. Following the meeting, Tirapelli, Stuppy, Wiskowski, and Pressman toured a building at 2233 South Throop Street in Chicago (Throop Street property).

Tirapelli recorded the meeting and later played the tape for Webb. After Tirapelli and Webb discussed the opportunity, Tirapelli arranged

---

[1]As the subscription documents governing the sale of shares in TCG explained, private placement investments are subject to limitations on transfer, and information about the investment is not reviewed by state or federal authorities for accuracy. Thus, private placement investments are inherently riskier than publicly traded securities.

a second meeting with Webb, Wiskowski, Pressman, and himself. Wiskowski and Pressman gave a presentation at the second meeting, after which plaintiffs agreed to purchase 2$^{1}$/$_{2}$ shares of TCG each at $100,000 per share. On March 24, 2000, plaintiffs signed the subscription documents which served as the contract for the sale of the shares, and later transferred the funds for the purchase. The subscription documents stated in the "Terms of the Offering" section:

> "The Company [TCG] has been formed to invest in one or more telecommunications, internet, information technology or other technology based companies. \*\*\* In addition, the Company anticipates that it will invest in a limited liability company or other entity which will hold the real estate and improvements located at 2233 S. Throop, Chicago, Illinois \*\*\* (the 'Commonwealth Edison Property'). The Commonwealth Edison property is currently under contract to Jack Pressman or an affiliate. The Company [TCG] will also purchase up to 2,500,000 Series A Preferred Shares \*\*\* of OptimalPATH Digital Network, Inc."

In addition, the subscription documents contained both a nonreliance clause and an integration clause. The nonreliance clause stated:

> "[I]n evaluating the suitability of an investment by the undersigned Company, the undersigned has relied solely upon the materials made available to the undersigned at the undersigned's request and independent investigations made by the undersigned in making the decision to purchase the Preferred Membership Interests subscribed for herein, and acknowledges that no representations or warranties (oral or written), have been made to the undersigned with respect thereto."

The integration clause stated:

> "The Subscription Documents constitute the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a written execution of all parties."

The subscription documents contained several warnings about various risks involved with the investment and required plaintiffs to verify that they were "accredited investors," which the subscription documents defined, *inter alia*, as persons with net worths exceeding $1 million at the time of purchase. According to the subscription documents, the investment was not registered under the federal Securities Act of 1933 (15 U.S.C. § 77(a) *et seq.* (2000)) and, thus, only accredited investors could purchase shares.

In May 2001, plaintiffs tendered their shares to Advanced and sought a return of the money they had invested after plaintiffs allegedly learned that some representations made by defendants regarding TCG were false. Defendants refused to rescind the transaction or return the money. Plaintiffs ultimately lost all of their investment.

Plaintiffs brought suit in federal court, asserting claims against defendants for: (1) violation of section 10(b) of the Securities Exchange Act of 1934 (Securities Exchange Act) (15 U.S.C. § 78j(b) (2000)) and Rule 10b—5 of the Securities and Exchange Commission (Rule 10b—5) (17 C.F.R. § 240.10b—5 (2000)), which was promulgated under the Securities Exchange Act; (2) violation of sections 12(F), 12(G), and 12(I) of the Illinois Securities Law (815 ILCS 5/12(F), (G), (I) (West 1998)); and (3) Illinois common law fraud.

The federal court granted summary judgment in favor of defendants on the federal securities fraud count because the nonreliance and integration clauses made reliance on alleged oral misrepresentations unreasonable as a matter of law. The federal court dismissed plaintiffs' state claims.

Plaintiffs then filed a complaint in the circuit court of Cook County. Plaintiff's complaint was based on the same allegations that they had made in federal court. Count I sought recovery under the Illinois Securities Law (815 ILCS 5/12(F), (G), (I) (West 1998)). Count II was based on common law fraud. Both counts were based upon the following representations that plaintiffs alleged Wiskowski and Pressman made during the two meetings with plaintiffs before plaintiffs signed the subscription documents:

    (1) that TCG owned the Throop Street property, having purchased it for $8 million;

    (2) that TCG had entered into a lease for a portion of the Throop Street property;

    (3) that TCG had completed design work and entered into construction contracts for renovation of the Throop Street property for use by high-tech companies;

    (4) that TCG had completed all preliminary work for an initial public issue;[2] and

    (5) that few shares of TCG remained and that unless plaintiffs invested immediately they would lose the opportunity to invest.

None of those statements are found in the subscription documents.

The trial court granted summary judgment in favor of defendants for the same reason as the federal court: the nonreliance and integration clauses made plaintiffs' reliance on the oral representations unreasonable as a matter of law. Plaintiffs filed this timely appeal.

## ANALYSIS

■ Plaintiffs assert that defendants' alleged misrepresentations constitute common law fraud under Illinois law and also violate sections 12(F), 12(G), and 12(I) of the Illinois Securities Law (815 ILCS

---

[2]Only Tirapelli alleged to have relied on this statement.

5/12(F), (G), (I) (West 1998)). Section 12 of the Illinois Securities Law provides:

> "It shall be a violation of the provisions of this Act for any person:
>
> \* \* \*
>
> F. To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.
>
> G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact \*\*\*.
>
> \*\*\*
>
> I. To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly."

815 ILCS 5/12 (West 1998).

Because sections 12(F), 12(G), and 12(I) of the Illinois Securities Law are modeled after sections 17(a)(1) through (a)(3) of the federal Securities Act of 1933 (Securities Act) (15 U.S.C. § 77q(a)(1) through (a)(3) (2000)), Illinois courts look to federal securities fraud case law in interpreting those sections of the Illinois Securities Law. *People v. Whitlow*, 89 Ill. 2d 322, 333-34 (1982); *Foster v. Alex*, 213 Ill. App. 3d 1001, 1005 (1991). Sections 17(a)(1) through (a)(3) of the Securities Act (15 U.S.C. § 77q(a)(1) through (a)(3) (2000)) require nearly the same elements as section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b) (2000)), and Rule 10b—5 (17 C.F.R. § 240.10b—5 (2000)). *Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1536 (S.D.N.Y. 1983). To prevail in a Rule 10b—5 claim, a plaintiff must demonstrate that the defendant: (1) made a misstatement or omission, (2) of material fact, (3) with *scienter*, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused the plaintiff's injuries. *In re Healthcare Compare Corp. Securities Litigation*, 75 F.3d 276, 280 (7th Cir. 1996). However, *scienter* is not a required element under section 17(a)(3) of the Securities Act. *Aaron v. Securities & Exchange Comm'n*, 446 U.S. 680, 697, 64 L. Ed. 2d 611, 626, 100 S. Ct. 1945, 1956 (1980).

As the trial court correctly noted, reasonable reliance is an element of sections 12(F), 12(G), and 12(I) of the Illinois Securities Law (*Foster*, 213 Ill. App. 3d at 1006), as well as section 10(b) of the Securities Exchange Act and Rule 10b—5 (*Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000)), and Illinois common law fraud (*Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980)).[3] We begin our analysis with that element.

---

[3]We note that the terms "justifiable" and "reasonable" with regards to

Although normally a question of fact, a court can determine reasonable reliance as a matter of law "when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). In determining whether a party's reliance was reasonable, the court must consider all of the facts that the party knew, as well as those facts that the party could have discovered through the exercise of ordinary prudence. *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 125 (1995).

Relying on *Adler*, 271 Ill. App. 3d 117, and *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000), the trial court determined that the presence of the integration and nonreliance clauses in the subscription documents made plaintiffs' reliance on the alleged oral representations by defendants unreasonable as a matter of law. The gist of plaintiffs' primary argument in this appeal is that the "automatic" rule established in those cases is unfair and would result in injustice against them. They invite this court to hold that, *despite* the presence of a nonreliance clause in a contract, the determination of whether reliance on oral statements not contained in the contract is reasonable should be determined on a case-by-case basis. We decline to do so.

The plaintiffs in *Adler*, who had purchased interests in a real estate syndication, brought suit alleging common law fraud and violations of the Illinois Securities Law. *Adler*, 271 Ill. App. 3d at 119-20. Plaintiffs argued that they relied on alleged oral representations that one of the partners in the syndication would provide financial backing to the syndication. *Adler*, 271 Ill. App. 3d at 124.

The subscription agreement which the *Adler* plaintiffs signed contained a nonreliance clause which stated: " 'I have received and read the [private placement memorandum] and am hereby applying for the purchase of Units solely in reliance upon the information contained in the [memorandum] and not in reliance upon any other information.' " *Adler*, 271 Ill. App. 3d at 122. The memorandum stated that the partner would provide only $100 of capital to the syndication. *Adler*, 271 Ill. App. 3d at 126. Because the representation on which the plaintiffs allegedly relied conflicted with the memorandum, and because the subscription agreement contained a nonreliance clause, the court held that the plaintiffs' reliance was unreasonable as a matter of law. *Adler*, 271 Ill. App. 3d at 126-27.

The plaintiff in *Rissman* sold his shares in a business to the defendant, who was a co-owner in the business, in alleged reliance on

reliance in a fraud claim are used interchangeably. *Foster*, 213 Ill. App. 3d at 1006.

the defendant's statement that he would not sell the business. *Rissman*, 213 F.3d at 382. The contract for the sale of the shares included a clause which stated: "[T]his Agreement is executed *** without reliance upon any statement or representation *** except as set forth herein." *Rissman*, 213 F.3d at 383. After the defendant sold the business, the plaintiff sued to recover the amount he would have received from the sale of the business had he not sold his shares to the defendant, arguing that the defendant's statement that he would not sell the business was fraudulent under section 10(b) of Securities Exchange Act (15 U.S.C. § 78j(b) (2000)), and Rule 10b—5 (17 C.F.R. § 240.10b—5 (2000)). *Rissman*, 213 F.3d at 382-83. The *Rissman* court upheld the trial court's grant of summary judgment for the defendant and held that "a written anti-reliance clause precludes any claim of deceit by prior representations." *Rissman*, 213 F.3d at 384.

There are sound policy reasons for precluding fraud claims based on oral statements outside the written agreement where the agreement includes a nonreliance clause. As the *Rissman* court noted, placing primacy on the written word is a primary function of securities law and reduces the possibility of faulty memories and fabrication. *Rissman*, 213 F.3d at 383-84. Further, without such a rule, parties to securities transactions would be unable to avoid the risk of claims based on oral representations, thus reducing the value of the securities. *Rissman*, 213 F.3d at 384. We believe that the same reasoning applies to the Illinois Securities Law.

■ In the instant case, both plaintiffs own car dealerships. Each has substantial net worth and investments. Because private placement investments are inherently risky, they are not made available to unsophisticated investors. As sophisticated business people, plaintiffs certainly could have negotiated for inclusion in the subscription documents of the oral statements that were allegedly so important to their investment decision. Having agreed in writing that they did not rely on any representations found outside the subscription documents, plaintiffs cannot be allowed to argue fraud based on such representations.

Plaintiffs now argue on appeal that the nonreliance clause should not preclude their fraud claims because the nonreliance clause conflicts with another clause in the subscription documents that urged the plaintiffs to request additional information from Wiskowski. Plaintiffs did not raise this argument below and may not raise it for the first time on appeal. *Eagan v. Chicago Transit Authority*, 158 Ill. 2d 527, 534 (1994).

In any event, plaintiffs' argument is meritless. It is perfectly consistent in a private securities transaction among sophisticated par-

ties for the offeror to invite the prospective investor to make his or her own investigation and yet also require the investor to disavow reliance on any statements that were not contained in the final writing. The *Adler* court upheld a nonreliance clause despite the presence of a clause inviting the plaintiffs to ask questions about the investment and to verify the information in the documents because "[t]o accept the plaintiffs' contention [that the nonreliance clause is invalid] is to hold the written agreement for naught." *Adler*, 271 Ill. App. 3d at 127.

Plaintiffs attempt to distinguish the clause inviting questions in *Adler* from the clause in the instant case by arguing that the clause in *Adler* only pertained to information included in the written agreement, while the clause inviting questions in the instant case had no such limitation. But regardless of what information plaintiffs were invited to inquire about, the nonreliance clause clearly indicates that plaintiffs were not to rely on any information acquired from those inquiries, even information from Wiskowski, unless the information was included in the subscription documents.

Plaintiffs also argue that the nonreliance clause functions as an exculpatory clause and that exculpatory clauses do not protect against intentional torts. Plaintiffs cite several cases in support of this argument. However, none of those cases involved securities transactions between sophisticated parties. We find *Rissman*, 213 F.3d 381, and *Adler*, 271 Ill. App. 3d 117, to be more applicable to the instant case and reject plaintiffs' exculpatory clause argument.

Finally, plaintiffs argue that the integration clause does not bar them from bringing fraud claims based on statements found outside the written agreements. To support this assertion, plaintiffs cite several cases: *Salkeld v. V.R. Business Brokers*, 192 Ill. App. 3d 663 (1989); *Spindler v. Krieger*, 16 Ill. App. 2d 131 (1958); *Lehman v. Hill*, 414 Ill. 173 (1953); and *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 216 F.3d 641 (7th Cir. 2002). However, those cases involved contracts that contained integration clauses, but which did not contain nonreliance clauses. In fact, the *Vigortone* court specifically noted this distinction, stating: "[P]arties to contracts who do want to head off the possibility of a fraud suit will sometimes insert a 'no-reliance' clause into their contract \*\*\*. Since reliance is an element of fraud, the clause, if upheld, \*\*\* precludes a fraud suit." *Vigortone*, 316 F.3d at 644. Thus, plaintiffs' argument that an integration clause does not preclude a fraud claim is not relevant.

Plaintiffs' reliance was unreasonable as a matter of law. Therefore, plaintiffs are unable to establish the reliance element required by their Illinois Securities Law and common law fraud claims. Plaintiffs'

failure to establish the reliance element is dispositive, and we need not address the other elements of plaintiffs' claims.

For the foregoing reasons, we affirm the trial court's grant of summary judgment in favor of defendants.

Affirmed.

O'MARA FROSSARD, P.J., and FITZGERALD SMITH, J., concur.