2016 IL App (1st) 143051

No. 1-14-3051

Opinion filed June 30, 2016

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

JJR, LLC; BLAIR FREDRICH IRA and )  Appeal from the
BLAIR FRIEDRICH as owner-beneficiary, )  Circuit Court of
DANIEL C. IDZAL, JAIMIE KLINE, ANNE )  Cook County.
K. MORNINGSTAR 2006 REVOCABLE )
TRUST, LESLIE MORNINGSTAR )  No. 2010 L 014697
IRREVOCABLE TRUST USAD 12-11-98, )
MADISON R. MORNINGSTAR )  Honorable Judge
REVOCABLE TRUST DTD 118-90, )   Thomas R. Mulroy, Jr.,
BARBARA KLINE HERMAN, JOHN )   Judge, presiding.
MORNINGSTAR 5-21-75 TRUST, MOLLY )
GERBAZ 5-21-75 TRUST, PEMAQUID )
POINT INVESTMENT COMPANY, LLC, )
SPECIAL PEOPLE IN NEED, THE )
SCHWEPPE FOUNDATION, GARY H. )
KLINE, GARY H. KLINE IRA ROLLOVER )
and GARY H. KLINE as owner-beneficiary, )
JOSEPH R. and MARTHA M. MEMBRINO, )
RUSS M. HERMAN, ANDREW E. KLINE )
SEP IRA and ANDREW E. KLINE as owner- )
beneficiary, THERESA L. KLINE IRA and )
THERESA L. KLINE as owner-beneficiary, )
NEGAR ALIMAMAGHANI, MASSAD & )
MASSAD INVESTMENTS, LTD., )
THOMAS E. CALLAHAN, FRANK W. )
BRAZITAS, DAVID B. SCOTT, PETER )
CRAIG WOOD, R.H. STRICKLER, )
DUNCAN W. CAMPBELL, HOPKINS )
INVESTMENT LIMITED PARTNERSHIP, )

No. 1-14-3051

THE CHASE FOUNDATION OF )
VIRGINIA, DS&S CHASE, LLC, THE )
STUART F. CHASE 2001 REVOCABLE )
TRUST, THE D. SUMNER CHASE, III 2001 )
IRREVOCABLE TRUST, STUART F. )
CHASE, JAMES L. JESSUP, JR., )
 )
 Plaintiffs-Appellants, )
 )
v. )
 )
WILLLIAM J. TURNER, SIGNATURE )
CAPITAL LLC, SIGNATURE CAPITAL )
SECURITIES LLC, WILLIAM G. FRAINE, )
STEPHEN A. CONE, JON GUYATT and )
HUGH E. SAWYER, )
 )
 Defendants-Appellees. )

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.

Presiding Justice McBride and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    This case arises from a dispute between plaintiffs, JJR, LLC, *et al.*, and defendants William J. Turner, *et al.*, which involved defendants' alleged inducement of plaintiffs to invest in Eggs Overnight, Inc. (Eggs), a start-up company, based on allegedly false statements and misrepresentations. Plaintiffs collectively invested $4.61 million in Eggs and claimed $7,989,595.98 in damages. Signature Capital Securities, LLC, and Signature LLC were defaulted by the court and a judgment was entered against them for $7,989,595.98. A bench trial resulted in a finding in favor of Turner, the remaining defendant. Plaintiffs appeal contending that: (1) the circuit court failed to address their claim alleging violation of section 12(H) of the Illinois Securities Law of 1953 (815 ILCS 5/12(H) (West 2010)); (2) reliance is

not an element of a section 12(H) claim; (3) with respect to their subsection (F) and subsection (G) claims, reliance is determined at the time of irrevocable investment; (4) the circuit court misassessed the testimony regarding reliance; and (5) neither boilerplate risk disclosures nor the roll-out schedule cured the executive summary's numerous, specific, and emphatic misrepresentations. For the reasons that follow, we affirm.

¶ 2                                          BACKGROUND

¶ 3        On December 29, 2010, plaintiffs filed a 10 count complaint against defendants alleging, *inter alia*, that defendants violated sections 12(F), (G), and (H) of the Illinois Securities Law (815 ILCS 5/12(F), (G), (H) (West 2010)), committed common-law fraud, and committed negligent misrepresentation. The case proceeded to a bench trial. At trial, Turner testified that he was a principal in defendant Signature Capital, a venture capital firm, and in Signature Capital, LLC (collectively, Signature). As part of his duties in Signature, Turner was the exclusive placement agent to find investors to purchase $25 million of preferred stock offerings for Eggs. The initial offering took place between December 2007 and April 2008 and was referred to as the "Series A" offering or the "bridge financing period." The investments during this period were actually bridge loans made to Eggs through convertible promissory notes. However, at Eggs' election, these convertible promissory notes would automatically be converted into stock. Investors did not have the option to cash out their loans. When the notes were converted, those people who had invested during the bridge financing period would also have the opportunity to purchase additional stock at a 20% discounted rate. The promissory notes expressly stated that the securities that would be issuable when the note was converted would not be registered under state or federal law. The majority of plaintiffs invested during this initial period.

¶ 4    During the bridge financing period, the only official written document that was available was the executive summary, which was drafted by the Eggs management team.[1] The executive summary is a 46-page document that gives an overview of the Eggs business plan. It describes its service of using reusable and "trackable" shipping containers and its business strategy of appealing to companies that ship high value or damaged goods. The executive summary included, among other things, diagrams of the Eggs shipping containers and a chart detailing the multi-phase roll-out schedule. The chart indicates that the "Smart Shell" tags with the Global Positioning System (GPS) and Radio Frequency Identification (RFID) technology would be available sometime between January and June 2009.

¶ 5    Plaintiffs allege that several statements in the executive summary were false or misleading. As many of the allegedly false statements are similar and repetitive, the following are examples excerpted from the executive summary:

"Eggs service offering is: *** the first to use embedded hybrid GPS/Cellular technology to track containers; the first to use embedded RFID technology to monitor container wear and shock levels as well as unauthorized container openings."

"Eggs Value-Added Capabilities Provide *** [a] [s]ophisticated and proprietary Internet-based transaction processing, tracking and monitoring system."

"Embedded inside the Egg Safe container is a hybrid of state-of-the art GPS and Cellular technologies (Smart Shell) for container tracking and state-of-the art based RFID technology for monitoring container heat and shock levels as well as unauthorized

---

[1]The Eggs management team consisted of Hugh Sawyer (chair), Jon Guyette (president and CEO) and Bill Fraine (executive vice president of sales and marketing).

openings for every container throughout its journey from shipper location to end recipient."

"MARKET VALIDATION: The company has already achieved proof-of-concept of its damage, resistant reusable container technology and its end-to-end logistics transit."

¶ 6 Notably, the first page of the executive summary included cautionary language that stated: "THESE MATERIALS INCLDUE OR MAY INCLUDE CERTAIN STATEMENTS, ESTIMATES AND FORWARD-LOOKING PROJECTIONS OF THE COMPANY WITH RESPECT TO THE ANTICIPATED FUTURE PERFORMANCE OF THE COMPANY. SUCH STATEMENTS, ESTIMATES AND FORWARD-LOOKING PROJECTIONS REFLECT VARIOUS ASSUMPTIONS OF MANAGEMENT THAT MAY OR MAY NOT PROVE TO BE CORRECT AND INVOLVE VARIOUS RISKS AND UNCERTAINTIES. PLEASE CONTACT US FOR FURTHER INFORMATION."

¶ 7 Additionally, during the bridge financing period, the Eggs team, along with Turner, traveled to several cities to solicit investors at in-person meetings. Plaintiffs similarly allege that oral statements made at the meetings and statements in the PowerPoint presentation given at the meetings, were false or misleading. The same PowerPoint presentation was also attached to some personal e-mails Turner sent to potential investors. Examples of the PowerPoint slides with allegedly false representations are detailed below.

"EGGS, A UNIQUE BUSINESS CONCEPT ***

- Holistic Solution–EGGS' Proprietary, Reusable, Containers linked with GPS Technology-Driven Supply Chain Logistics Service

    ***

LEVERAGING PROPRIETARY TECHNOLOGY \*\*\* Reusable 'SMARTSafe' Container

- Shock resistant 'Outers' (Plastic Corrugated)

- Mass-customized 'Inners'

- Global tracking (GPS/Cellular)

- Monitoring–Shock, temperature & un-authorized opening (RFID)

\* \* \*

Eggs, A Breakthrough

- We have invented a patented, reusable container that virtually eliminates damage from shock and dramatically reduces source waste because it *is* reuseable

- Our Egg Safe ContainerTM is technically sophisticated and self-diagnostic with real time tracking and product monitoring capability"

¶ 8    Additionally, the PowerPoint presentation contained a written disclosure, which stated:

"This document is not a prospectus for the purpose of a securities offering. It is furnished for information only. No representation or warranty is made by Eggs as to the accuracy or completeness of such information and nothing contained in the summary is or shall be, relied on as a promise or representation as to the future."

¶ 9    Plaintiffs further contend that Turner sent e-mails to potential investors that contained allegedly false and misleading information. These e-mails were sent between December 2007 and September 2008. Plaintiffs allege numerous false representations in the e-mails. Only relevant excerpts from various e-mails are reproduced below.

"EGGS SMARTSafe containers have, embedded inside, a hybrid combination of state of the art GPS and Cellular technology for container tracking and state of the art based RFID technology for monitoring of container heat and shock levels, as well as unauthorized openings for EVERY container throughout its journey from shipper location to end recipient." (December 4, 2007).

"EGGS has strong Intellectual Property, with 7 patents granted/applied for, both technology and methods patents, as well as several more patents soon to be submitted." (December 4, 2007).

"EGGS is a first mover, GREEN-TO-THE-EXTREME, breakthrough product-shipper service, offering damage resistant, real time tracked, and 'real time enough' monitored (heat, shock, and unauthorized openings) reusable, shock resistant, highly patented containers to be used to transport highly damaged and high value goods in the parcel industry." (December 12, 2007).

"State-of-the-art and novel use of GPS-cellular-RFID technology is heavily deployed in the EGGS containers and supply chain network." (December 12, 2007).

"[Eggs'] sustainability of the competitive edge is ensured with the high tech reusable container, coupled with a novel Mother Hen Internet software service system, and industry knowhow that tracks and monitors (shock-leve[l], temp level, water seep, and unauthorized opening, supply chain logistics, etc.) throughout the end-to-end multi leg, journey of the container." (December 19, 2007).

"The EGGS ('Not-a-Yolk Broken') containers have embedded tracking technology, and temperature, shock level, and unplanned opening monitoring technology, and comes

with a sophisticated Mother Hen (nurturing and caring) internet based service system that manages a shipper's end-to-end and global supply chain issues." (February 3, 2008).

"Eggs is a unique, first to market, elegant, global supply chain logistics solutions service company *** providing shippers of high value, damage prone products, the first major damage resistant breakthrough offering in the shipper marketplace in over a decade, leveraging its proprietary shock-resistant, high tech (GPS, cellular, RFID) proprietary reusable (plastic corrugated) containers." (March 6, 2008).

¶ 10 Significantly, in most of the e-mails in question, Turner included the same disclosure statement as in the executive summary. This disclosure explicitly communicates that the information in the e-mail was based on forward-looking projections and the assumptions of Eggs' management.

¶ 11 Turner testified that on April 2, 2008, Eggs elected to convert the convertible promissory notes into stock and presented the investors with a formal private placement memorandum (PPM) and a subscription agreement. The PPM stated that none of the securities offered pursuant to the PPM were registered under state or federal law. Plaintiffs allege that the PPM contained misleading language because it purported, *inter alia*, to have achieved proof-of-concept validation. Specifically, the PPM stated, "MARKET VALIDATION: The Company has already achieved proof-of-concept of its damage, resistant reusable container technology and its end-to-end logistics transit with several pilot companies." However, the PPM also contained several pages of risk disclosures. Within the risk disclosures, the PPM expressly stated that although Eggs' management believed Eggs was first to market, "there is no guarantee that the current entrenched competitors will not soon develop similar offerings and obviate the marketing and product advantages that the Company anticipates."

¶ 12      Additionally, the risk disclosures in the PPM informed investors that the GPS and RFID technology was not available at that time and a risk existed that Eggs would not achieve its technology goals. Specifically, the language of the risk disclosure reads, "[s]uccessful development of our container and technology depends on a number of factors, including: *** our ability to timely complete design and testing of new software and hardware components and products."

¶ 13      At the same time investors were given the PPM, they were presented with the subscription agreement. The subscription agreement contained a nonreliance clause, which, when signed, attested that the investor did not rely on any information that was contrary to the information in the PPM. The subscription agreement provides, in relevant part:

"Representations and Warranties. The Purchaser hereby acknowledges, represents, warrants, and agrees as follows:

* * *

(f) In evaluating the suitability of an investment in the Company, the Purchaser has not relied upon any representation or other information (oral or written) other than as stated in the Memorandum or as contained in documents or answers to questions so furnished to the Purchaser or the Purchaser's Advisors by the Company.

* * *

(j) The Purchaser is not relying on the Company, the Placement Agent or any of their respective employees or agents with respect to the legal, tax, economic and related consideration of an investment in the Securities, and the Purchaser has relied on the advice of, or has consulted with, only his own Purchaser's advisors, if any;

* * *

(v) No oral or written information furnished, to the Purchaser or the Purchaser's Advisor, if any, in connection with the offering of the Securities which are in any way inconsistent with the information contained in the Memorandum[.]"

¶ 14    Turner testified that in October 2008, only months after investors signed the subscription agreement, Eggs experienced financial difficulties and went into "hibernation" to save money. After requests from investors, including Gary Kline, Eggs was restarted in February 2009. In a letter dated February 2, 2009, Turner notified investors of the restart and, among other things, stated that the GPS, cellular, and RFID technology had not been developed. Eggs attempted to "re-stock" the company but it ultimately failed. By the middle of 2010 Eggs did not have sufficient finances to continue its operation and filed for bankruptcy. None of the 34 investors recovered the money they invested.

¶ 15    Turner admitted that despite the language in the executive summary, the PowerPoint presentation, the e-mails, and the PPM, Eggs at no time had fully developed the Eggs carton with the RFID and GPS technology. He explained that Eggs had process patents for the service that Eggs would provide but it did not have technology patents. In other words, Eggs had invented the idea, but had not actually invented the necessary technology. In addition, because Eggs had not developed a finished prototype, it had never tested the Eggs product in the market in a pilot program. Turner maintained, however, that investors were aware that the technology was not fully developed. He explained that they were told at the presentations that there would be a multiphase roll-out and that the cartons with the RFID and GPS technology were not anticipated until 2009. He averred that only sophisticated investors were solicited for Eggs and these investors, many of who had invested in other risky start-ups, were encouraged to ask questions at the presentations. In addition, the charts in the executive

summary and the PowerPoint made clear the embedded technology would not be available until 2009.

¶ 16    Jamie Kline testified that he invested in Eggs based on information in the executive summary. He explained that he decided to invest in Eggs because he thought it was an original idea to have a shipping container that could be tracked and that would notify a shipper if the container was improperly opened. Jamie invested on three different occasions including during the 2009 restart of the company. He further testified that he moved to Georgia in July or August 2009 to work for Eggs. At that time there were approximately 30 boxes at the manufacturing facility, but none of them had RFID or GPS technology and he never saw a finished prototype of the Eggs container.

¶ 17    Jamie further testified that he invested in the restart and moved to Georgia to work for Eggs because he believed that if he did not invest again, his original investment would be lost. He also believed that if he was more involved in the operation he could help Eggs be successful. In addition, his cousin, Gary Kline, was about to become a board member so he knew they would have more control over Eggs' future. Jamie admitted that in February 2009, even with the knowledge that the containers did not have GPS or RFID technology, he believed that Eggs still had merit to survive as a company. Jamie additionally admitted that he thought the box without the embedded technology but with the Eggs process was a capable product that would be attractive to potential customers. Notably, Jamie testified that he believed Eggs failed for a number of reasons including mismanagement and market forces.

¶ 18    Gary Kline testified that he was introduced to Eggs by Turner and he relied on the executive summary when he decided to invest in Eggs. He further testified that he reviewed

the PowerPoint presentation and relied on that as well. Gary attended several oral presentations and he testified the Eggs' team did not convey any information verbally that was inconsistent with the executive summary or the PowerPoint presentation. He invested in Eggs because the embedded GPS technology made it a niche product in the parcel delivery industry. Believing Eggs to be a good investment, Gary convinced several of his friends and family members to invest in Eggs. Gary also invested money from trusts he was managing as a trustee.

¶ 19     Derwood Chase testified that he relied on the executive summary and the PowerPoint presentation when he decided to invest in Eggs personally, and when he invested on behalf of the trusts he managed as a trustee. Chase maintained that he invested in Eggs because of the embedded RFID and GPS technologies. However, he admitted that he knew Eggs was a start-up and therefore a risky investment. Further, Chase testified that he received an e-mail from Turner dated December 22, 2007, which stated that "our first deliverable product with revenue expected to start in Quarter 1 '08 does not require GPS/Cellular and RFD monitoring tags[.] *** Eggs conservatively estimates that the GPS cellular units will be available Quarter 1 2009." Chase admitted that in 2008, subsequent to receiving this e-mail that disclosed the roll-out schedule, he invested more money into Eggs and solicited others to invest in Eggs.

¶ 20     Chase acknowledged that he looked at an Eggs container at an in-person meeting, and he did not observe a device with GPS or RFID technology in the container. He also admitted that he knew from reading the executive summary that Eggs was going to have a multiphase operational roll-out and that the Eggs' GPS cellular capabilities would not be commercially available until Quarter 1, 2009. He agreed that as of November 2008, months after he was

aware that the RFID and GPS technology was not present in the Eggs containers, he believed Eggs was a worthwhile investment.

¶ 21 Both parties submitted closing arguments in written posttrial briefs. In plaintiffs' brief they contended, *inter alia*, that section 12(H) of the Illinois Securities Law was violated and does not require that a plaintiff prove reliance. Plaintiffs also reasserted their sections 12(F), 12(G), common-law fraud, and negligent misrepresentation claims.

¶ 22 The court entered a 21-page written order in favor of Turner and against plaintiffs on all counts. In ruling, the trial court noted that "[s]ections 12(F) through (I) of the Illinois Securities Law are modeled after §17(a)(1) through (a)(3) of the federal Securities Act of 1933" (citing *Lucas v. Downtown Greenville Investors Ltd. Partnership*, 284 Ill. App. 3d 37, 45 (1996)). The court continued by explaining that "[t]o prove a violation of §12(F) and (G) of the Act, Plaintiff must show Defendant; (1) made a misstatement or omission; (2) of material fact; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied" (citing *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 455 (2004)). The court then provided a detailed analysis regarding whether plaintiffs could have reasonably relied on the alleged misstatements made by defendants. It noted that the subscription agreement, which was signed by plaintiffs, contained a nonreliance clause and informed investors that certain technology was not yet developed, and that the PPM listed risk factors with warnings that Eggs International, Inc., was a risky investment. The court concluded that, with this information available, plaintiffs could not have reasonably relied on any alleged false representations. Furthermore, the court separately found that plaintiffs failed to prove reliance because only 3 of 34 plaintiffs testified at trial and none of those plaintiffs established that they actually relied on the alleged misrepresentations to their

detriment. The court specifically noted that it did not find Jaime Kline, Gary Kline, or Derwood Chase credible. Finding that plaintiffs could not prove reliance, the court also denied the common-law fraud and negligent misrepresentation claims, for which reliance is an essential element. The court concluded the order by stating that "[t]he Court finds for Defendant William J. Turner and against Plaintiffs on all counts." Plaintiffs did not file a posttrial motion.

¶ 23                                                    ANALYSIS

¶ 24                                            A. Section 12(H) Claim

¶ 25          Initially, we address plaintiffs' assertion that the trial court failed to rule on their section 12(H) Illinois Securities law claim. Plaintiffs, having taken the position that the claim was not disposed, invite our *de novo* review. They argue throughout their brief that unlike sections 12(F) and (G), reliance is not required to prevail on their section 12(H) claim. Contrary to plaintiffs' assertion, a review of the trial court's written order reveals that the circuit court expressly ruled in favor of defendant "on all counts." Thus, we presume that the trial court's ruling was dispositive of all of plaintiffs' claims.

¶ 26          Although we have a final judgment, the record is devoid of the court's reasoning in disposing of the section 12(H) claim. Absent that reasoning, we are unable to determine on what basis the court disposed of plaintiffs' section 12(H) claim. Regardless of the basis, or even whether the court's reasoning was correct, we review the court's judgment, not its reasoning, and we may affirm the circuit court on any grounds supported by the record. *Bruel & Kjaer v. Village of Bensenville*, 2012 IL App (2d) 110500, ¶ 22.

¶ 27          Plaintiffs maintain that section 12(H) establishes presumptive liability whenever a false statement is made in written materials given to prospective investors and consequently they

were not required to prove reliance. Defendants failed to respond to this argument, but instead point out that the relevant inquiry is whether the alleged false statements are material. Whether reliance is required for a section 12(H) claim under the Illinois Securities Law is an issue of statutory interpretation, which we review *de novo*. *Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 2014 IL 116362, ¶ 20.

¶ 28　　　Before proceeding with our analysis, we set forth below the relevant provisions of section 12 of the Illinois Securities law:

"§12. Violation. It shall be a violation of the provisions of this Act for any person:

* * *

(F) To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

(G) To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

(H) To sign or circulate any statement, prospectus, or other paper or document required by any provision of this Act or pertaining to any security knowing or having reasonable grounds to know any material representation therein contained to be false or untrue." 815 ILCS 5/12(F), (G), (H) (West 2010).

¶ 29　　　　　　　　　　Section 12(H) Construed

¶ 30    It is significant to note that the Illinois Securities Law was modeled after the federal Securities Act of 1933 (federal Act). 15 U.S.C. § 77a *et seq.* (2000). Thus, Illinois courts have consistently looked to the corresponding provisions of the federal Act in interpreting the Illinois Securities Law. *Lucas v. Downtown Greenville Investors Ltd. Partnership*, 284 Ill. App. 3d 37, 45 (1996); *Foster v. Alex*, 213 Ill. App. 3d 1001, 1004-05 (1991). In this case, although the trial court broadly stated that sections 12(F) to (I) of the Illinois Securities Law were modeled after section 17 of the federal Act,[2] we have found no support for the proposition that section 12(H) was modeled after that section. In fact, our research has produced little Illinois case law that analyzes section 12(H) at all, and none that holds this section is based on section 17. Rather, Samuel H. Young, a principal drafter of the Illinois law, explained that Illinois's section 12(H) is based on section 12 of the federal Act. Samuel H. Young, *Interpretive Comments and Notes on Sections of the Securities Law of 1953 as Amended*, Ill. Ann. Stat., ch. $121^1/_2$, App'x, at 629 (Smith-Hurd 1960). We find support for Young's explanation in the plain language of the two provisions.

¶ 31    Section 12 of the federal Act provides:

"Any person who-

***

(2) offers or sells a security *** by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and

---

[2]This court has previously observed that sections 12(F) and 12(G) are modeled after sections 17(a)(1) to (a)(3) of the Federal Securities Act of 1933. *Lucas v. Downtown Greenville Investors Ltd. Partnership*, 284 Ill. App. 3d 37, 45 (1996); 15 U.S.C. § 77q(a)(1), (a)(2) (2000) .

who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, or such untruth or omission, shall be liable ***."

15 U.S.C. § 77*l*(a)(2) (2000).

¶ 32     We recognize that the language of the two provisions varies. However, similar to section 12(H) of the Illinois Securities Law, section 12 of the federal Act imposes liability for material false statements contained in prospectuses and statements pertaining to securities. Both of these provisions target false statements disseminated to solicit investors. Furthermore, none of the other provisions in the federal law, including section 17, so closely address the particular harm that section 12(H) of the Illinois law is designed to address. Accordingly, we accept Young's explanation and conclude, therefore, that section 12(H) of the Illinois Securities Law is based on section 12 of the federal Act.

¶ 33     Having determined the similarities between the state and federal provisions, it is significant to note that section 12(H) of the Illinois Securities Law, which was first enacted in 1953, remained unchanged until 2003. In 2003, section 12(H) was amended to add the words "or pertaining to any security." Pub. Act 93-580 (eff. Aug. 21, 2003). The amendment, however, did nothing to alter the similarity between the state and federal provisions. A review of the legislative history reveals that the amendments, which were also made to various other sections of the act, were made for the purpose of increasing investor protection as well as the Secretary of State's enforcement powers. Final Legislative Synopsis and Digest of the 93d Ill. Gen. Assem. (No. 15), at 1067. Specifically, the transcript of the Illinois Senate debate at which this bill was passed states, *inter alia*, that the amendments were enacted "to enhance investor protection" and "mandate[ ] accurate audit and financial statements, require[ ] firms to keep adequate records, and impose[ ] restrictions on those

firms that failed to supervise employees who engaged in misconduct." 93d Ill. Gen. Assem., Senate Proceedings (Apr. 8, 2003), at 43 (statements of Senator Welch). Although these amendments expanded protections to investors and increased the government's enforcement power, nothing in their language or the legislative history suggests that we should depart from analyzing section 12(H) under the structure set forth in federal case law. Accordingly, we look to the analysis of section 12 of the federal Act in our review of section 12(H) of the Illinois law.

¶ 34     Unlike the dearth of Illinois law analyzing section 12(H), case law regarding section 12 of the federal Act is abundant. Within the federal line of cases analyzing section 12, it is well established that a showing of reliance on an alleged false or misleading statement is not required. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 576 (1995); *In re Fuwei Films Securities Litigation*, 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009). To succeed under section 12, a plaintiff must only prove that the "(1) [d]efendant sold or offered a security; (2) by means of a prospectus or oral communication; (3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not misleading." *Fuwei Films Securities Litigation*, 634 F. Supp. 2d at 435. Thus, because reliance is not required, section 12 imposes liability more easily but is more narrowly applied than section 17, as discussed below.[3] *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d 347, 359-60 (2d Cir. 2010).

¶ 35     Consistent with construction of section 12 of the federal Act, we similarly find that proof of reliance is not required to prevail on a section 12(H) claim under the Illinois Securities

___

[3]Section 10(b) of the Exchange Act, which is almost identical to section 17 in the Securities Law of 1933, is the " 'catchall' cousin" of section 12 and is meant to apply more broadly. *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 455 (2004).

Law of 1953. Rather, all that must be shown is: (1) a statement, prospectus, or other paper or document, (2) that is required by the Act or pertains to securities, (3) contained a material false statement or omission. 815 ILCS 5/12(H) (West 2010); see *Fuwei Films Securities Litigation*, 634 F. Supp. 2d at 435. Like a section 12 claim under the federal Act, the main issues in a section 12(H) Illinois Securities Law claim are whether a false statement exists and whether it was material. See *In re Morgan Stanley Information Fund Securities Litigation*, 592 F.3d at 359-60. Thus, as it turns out, plaintiffs are correct that reliance is not a necessary element in a section 12(H) claim. We are mindful that the trial court did not make factual findings as to whether false statements existed or whether the alleged false statements were material. Regardless, as we explain below, plaintiffs' section 12(H) claim fails for another reason. Federal case law interpreting federal section 12 is instructive.

¶ 36                    Section 12 and Public Versus Private Offerings

¶ 37          In *Gufstafson*, the United States Supreme Court considered whether section 12 of the federal Act applied to a private sale contract for securities. *Gufstafson*, 513 U.S. at 564. The court held that section 12, which imposes liability for false statements in a prospectus or oral statements regarding a prospectus, only applied to public sale offerings. *Id.* In so ruling, the court explained that under the Act a prospectus must include information contained in the registration statement, which is only required for public offerings. *Id.* at 569. Thus, section 12 only applies to public offerings. *Id.*

¶ 38          Significant to our case, the *Gufstafson* court explained that reliance is not required under section 12, in part, because section 12 is limited to public offerings. *Id.* at 576. In considering the federal Act's legislative history, the Court reasoned that "[i]n light of the care that Congress took to justify the imposition of liability without proof of either fraud or reliance on

'those whose moral responsibility to the public is particularly heavy'–the 'originators of securities'–we cannot conclude that Congress would have extended this liability to every private or secondary sale without a whisper of explanation." *Id.* at 582; see also H.R. Rep. 85, 73d Cong. (1st Sess. 1933)). The court noted that it was reluctant to impose new substantive obligations and that it is more reasonable to interpret section 12 as providing a remedy for violations of the obligations that the Act created. *Id.* at 572. Subsequent courts explained that the *Gufstafson* court's holding that section 12 does not apply to private sales extends to private offerings for which a PPM is created because they are not registered under the Act. *Faye L. Roth Revocable Trust v. UBS Painewebber, Inc.*, 323 F. Supp. 2d 1279, 1293-94 (S.D. Fla. 2004).

¶ 39                     Section 12(H) and Public Versus Private Offerings

¶ 40        Section 12(H) of the Illinois law states that it applies to false statements or omissions contained in statements, prospectuses, or other paper documents required by the Act or pertaining to any security. 815 ILCS 5/12(H) (West 2014). Similar to the federal Act, which applies to prospectuses required for public offerings, prior to 2003, section 12(H) expressly stated that it applied only to documents required by the Act.[4] Under section 4(G) of the Illinois Securities law, limited offerings (*i.e.*, private offerings) are exempt from securities registration obligations. 815 ILCS 5/4(G) (West 2014). Accordingly, in a limited offering, there are no statements, prospectuses, or other paper documents required by the Act other than the report of sale that must be filed to qualify for the exemption. *Id.* However, the

---

[4]To the extent that *People v. Bartlett*, 294 Ill. App. 3d 435 (1998), purports to hold that section 12(H) applies to statements that are not related to a public offering, we disagree. *Bartlett*, did not address section 12(H)'s relationship to the corresponding federal provision, section 12 of the federal Act, or whether section 12(H) of the Illinois law applied to private offerings.

Illinois legislature has explicitly stated that section 12(H) does not impose liability for the content of the report of sale. 815 ILCS 5/13(H) (West 2014). Thus, like the federal Act, because the Illinois Securities Law exempts limited offerings from the obligations that the law imposes, we hold that section 12(H) of the Illinois Securities Law of 1953 does not apply to limited offerings and only applies to offerings required to be registered, that is public offerings.

¶ 41    We again acknowledge that in 2003 the language "or pertaining to any security" was added to section 12(H). Pub. Act 93-580 (eff. Aug. 21, 2003). Although the legislative history is clear that the 2003 amendments intended to expand protections to investors generally, nothing in the legislative history indicates whether the amendment was also intended to broaden its application to include public and private offerings alike. Nevertheless, we do not believe that the Illinois legislature, in amending section 12(H), intended to drastically alter the section 12(H) purpose and applicability to be much broader than the federal Act upon which it was based without any explanation. The 2003 amendment is more reasonably interpreted as setting forth a violation not only when documents that the Act obligates registrants to create contain false statements or omissions, but also when any document that pertains to any security is created for a registered offering and contains false statements or omissions. To hold that reliance is not required, but not limited section 12(H) claims to registered offerings, would greatly expand the liability beyond what the legislature intended.

¶ 42    Our conclusion in this regard is bolstered by the very purpose of the Illinois Securities Law and the reason limited offerings are exempt from the Act. " '[T]he purpose of the [Illinois] Securities Law is to protect innocent persons who might be induced to invest their

money in speculative enterprises over which they have little control.' " *Carpenter v. Exelon Enterprises Co.*, 399 Ill. App. 3d 330, 334 (2010) (quoting *A.G. Edwards, Inc. v. Secretary of State*, 331 Ill. App. 3d 1101, 1110 (2002)). Limited offerings are exempt from the obligations of the law to facilitate small businesses' ability to raise capital. Samuel H. Young, *Interpretive Comments and Notes on Sections of the Securities Law of 1953 as Amended*, Ill. Ann. Stat., ch. $121^{1}/_{2}$, App'x, at 598 (Smith-Hurd 1960) When there are relatively few investors and smaller amounts of money raised, the concern that the investors will not be able to adequately investigate the soundness of the investment are mitigated. See *Securities & Exchanges Comm'n v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953). This is because generally, when an offering is private, investors have greater access to the necessary information to make an informed investment decision, more bargaining power to obtain information, and more control over the success over the enterprise. *Id*; *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 903 (5th Cir. 1977). These are not the "innocent investors" the Act seeks to protect.

¶ 43        By contrast, when an offering is made to the public at large, the concerns of deception and fraud in the sale of securities increase because investors are unable to independently obtain information and may not be as experienced in purchasing securities. *Ralston Purina Co.*, 346 U.S. at 125; *Doran*, 545 F.2d at 903. Therefore, a greater concern exists where a statement or document that is widely disseminated contains false or misleading information. Thus, the limited offering exemption "strike[s] a balance between protection of the public and freedom of action by the sellers of securities which would be broad enough to help small businesses in relatively small financing transactions yet narrow enough to limit abuses."

Samuel H. Young, *Interpretive Comments and Notes on Sections of the Securities Law of 1953 as Amended*, Ill. Ann. Stat., ch. $121^{1}/_{2}$, App'x, at 598 (Smith-Hurd 1960).

¶ 44                                    The Eggs Securities–Public or Private Offering

¶ 45        In this case, the parties make no claim that the Eggs securities were offered as anything other than a limited or private offering. As the nature of the offering is relevant to our disposition, we deem it appropriate to set forth what constitutes a private offering under Illinois law. Private security offerings are exempted from the Illinois Securities Law under the limited offering exemption. 815 ILCS 5/4(G) (West 2014); Samuel H. Young, *Interpretive Comments and Notes on Sections of the Securities Law of 1953 as Amended*, Ill. Ann. Stat., ch. $121^{1}/_{2}$, App'x, at 598 (Smith-Hurd 1960). In Illinois, an offer, sale, or issuance of a security is exempt from the securities law where:

> "(a) all sales of such security to residents of this State (including the most recent sale) within the immediately preceding 12-month period have been made to not more than 35 persons or have involved an aggregate sales price of not more than $1,000,000;
>
> (b) such security is not offered or sold by means of any general advertising or general solicitation in this State; and
>
> (c) no commission, discount, or other remuneration exceeding 20% of the sale price of such security, if sold to a resident of this State, is paid, or is given directly or indirectly for or on account of such sales." 815 ILCS 5/4(G)(1) (West 2014).

¶ 46        Here, the PPM expressly states that none of the securities offered were registered under either state or federal law. Further, both the convertible promissory note and the PPM by which the Eggs stock was offered to investors explicitly stated that the securities were not registered under federal or state laws. Moreover, the evidence at trial established that the

necessary requirements for the limited offering exemption were met. First, there were 34 investors in Eggs, and thus Eggs was sold to fewer than 35 persons. Second, Eggs was not offered by general advertising and was only offered to "accredited investors," as defined by regulation D promulgated under the federal Act. To be accredited as an individual, the individual must have a net worth that exceeds $1 million. 17 C.F.R. § 230.501 (2014). Third, Turner did not receive a commission, discount, or other remuneration exceeding 20% of the sale price of such security. It is unquestionable that the Eggs securities were not sold as part of a registered offering. Therefore, we find that the Eggs securities were offered as part of a limited or private offering and that, therefore, section 12(H) does not apply.

¶ 47    As we noted earlier, we may affirm the circuit court on any grounds supported by the record. *DiCosola v. Ryan*, 2015 IL App (1st) 150007, ¶ 8. For the reasons set forth above, we hold that like its federal counter-part, section 12(H) is only applicable to registered offerings (*i.e.*, public offerings). *Gufstafson*, 513 U.S. at 569; *Faye L. Roth Revocable Trust v. UBS Painewebber, Inc.*, 323 F. Supp. 2d 1279, 1293-94 (S.D. Fla. 2004). Because we conclude that the Eggs securities were limited or private offerings, section 12(H) does not apply and thus, plaintiffs' claim must fail.

¶ 48              B. Sections 12(F), 12(G), Fraud, and Negligent Misrepresentation Claims

¶ 49    We note that, unlike section 12(H), sections 12(F) and 12(G) of the Illinois Securities Law are modeled after section 17(a) of the federal Act. *Lucas*, 284 Ill. App. 3d at 45. As the "catch-all" for any fraud in the sale of securities, section 17(a) applies more broadly and imposes liability in both private and public offerings. *Gustafson*, 513 U.S. at 576-77; *United States v. Naftalin,* 441 U.S. 768 (1979); *Tirapelli*, 351 Ill. App. 3d at 455. In contrast to

section 12(H), reliance is an element of both sections 12(F) and 12(G) claims, as discussed below.

¶ 50 Plaintiffs contend that the denial of their section 12(F), section 12(G), fraud, and negligent misrepresentation claims was against the manifest weight of the evidence because the executive summary, in-person meetings, PowerPoint presentation, e-mails sent by Turner, and the PPM contained false and misleading information. Specifically, plaintiffs assert that defendant misrepresented that (1) Eggs were first to market, (2) the GPS and RFID technology was available, and (3) Eggs had proof of concept market validation. Plaintiffs further argue that these "false" statements were not cured by boilerplate risk disclosures or the nonreliance clause. Defendant asserts that, in the correct context, these statements were not false or misleading.

¶ 51 Section 12(F), section 12(G), fraud, and negligent misrepresentation claims each require that the plaintiffs prove reliance on the alleged false and misleading statements. See *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 456 (2004) (explaining that reasonable reliance is an element of both section 12(F) and section 12(G) claims); *Platinum Partners Value Arbitrage Fund, Ltd. Partnership v. Chicago Board Options Exchange*, 2012 IL App (1st) 112903, ¶ 29 (noting that reliance is an element of a common-law fraud claim); *Fox Associates, Inc. v. Robert Half International, Inc.*, 334 Ill. App. 3d 90, 94 (2002) (listing reliance as an element of a negligent misrepresentation claim). The trial court denied these claims because it found that plaintiffs were unable to establish that they reasonably relied on the alleged misrepresentations. Whether plaintiffs reasonably relied on an allegedly false statement is a question of fact. *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 456 (2004). A trial court's factual findings are given great weight on appeal. *In re Estate of*

*Ferguson*, 313 Ill. App. 3d 931, 938 (2000). Thus, we will not overturn a trial court's factual finding in a bench trial unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent or when the findings are unreasonable, arbitrary, or not based on evidence. *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23.

¶ 52    In this case, after hearing all of the evidence, the trial court found that the alleged false statements and misrepresentations were mitigated by the cautionary language and disclaimers attached to the executive summary, the e-mails, the PowerPoint, the PPM, and the nonreliance clause in the subscription agreement. In addition, relying on *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450 (2004) and *Rissman v. Rissman*, 213 F.3d 381, 383-84 (7th Cir. 2000), the trial court concluded that the nonreliance clause in the subscription agreement, which each plaintiff signed, precluded them from relying on any alleged prior oral or written representations when they decided whether or not to invest. The court also found that the roll-out schedule in the executive summary and the PowerPoint indicated that that the GPS and RFID technology would not be available until 2009, and thus plaintiffs had sufficient notice that the embedded technology was not available when they invested.

¶ 53    We acknowledge that the court emphasized the risk factors delineated in the PPM and the nonreliance clause in the subscription agreement in finding that plaintiffs did not reasonably rely. Plaintiffs assert that these documents were only available after they made irrevocable investments during the bridge financing period and thus have no bearing on whether they reasonably relied on the misrepresentations at the time they invested. Even if we did not consider the risk factors in the PPM and the nonreliance clause in the subscription agreement,

the court's finding that plaintiffs could not reasonably rely on the executive summary, the PowerPoint, and the e-mails due to the cautionary language attached to them, is not negated and is sufficient to support the court's judgment.

¶ 54     Moreover, even if the existence of the cautionary language alone did not support the trial court's judgment, the court specifically noted that it did not find Jamie Kline, Gary Kline, or Derwood Chase credible. The trial court is in a superior position to observe the conduct of witnesses, determine their credibility, and to weigh their testimony. *Thomas v. Weatherguard Construction Co.*, 2015 IL App (1st) 142785, ¶ 46. We will not second-guess the trial court's credibility determinations that are supported by evidence. *Prigano v. Prigano*, 405 Ill. App. 3d 801, 810 (2010). Here, the plaintiffs who testified were sophisticated investors. They were all aware that Eggs was a risky investment because it was a start-up company. Gary Kline testified that he continued to solicit investors for Eggs after he was aware of the alleged false statements. In addition, Jamie Kline and Derwood Chase testified that they believed that Eggs was a worthwhile investment even after they had received the PPM with the detailed risk factors that informed them of the status of the embedded technology and Eggs' lack of an established customer base. The remaining plaintiffs did not testify to independently establish reliance. Therefore, the court's determination that plaintiffs did not rely on the allegedly false statements in deciding to invest in Eggs is supported by the evidence.

¶ 55     Therefore, a review of the record reveals that the court gave detailed reasons supported by evidence for its determination that plaintiffs could not establish reliance. Accordingly, we do not find that the court's decision that plaintiffs could not maintain their section 12(F), section 12(G), fraud, and negligent misrepresentation claims, was against the manifest weight of the evidence.

¶ 56                                   CONCLUSION

¶ 57          For the reasons stated above, we affirm the judgment of the trial court.

¶ 58          Affirmed.